# Illinois Official Reports

## Appellate Court

---

### *In re Marriage of Tedrick*, 2015 IL App (4th) 140773

---

| | |
|---|---|
| Appellate Court Caption | In re: MARRIAGE OF LINDSAY M. TEDRICK, Petitioner-Appellant, and JONATHAN M. TEDRICK, Respondent-Appellee. |
| District & No. | Fourth District<br>Docket No. 4-14-0773 |
| Filed | January 29, 2015 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from the denial of the petition filed by the mother and residential parent of the parties' child to take the child with her to South Carolina where the mother had found a new job that would relieve her of the stressful and unremitting circumstances of the job she had in Illinois, the denial of her petition was reversed and the cause was remanded to the trial court with directions to make a new visitation schedule providing for liberal visitation for respondent father, since the removal would likely result in an improvement in the quality of life for the mother and the child, the mother was motivated by her intention to improve her employment circumstances and be closer to her family living in South Carolina, not to impair respondent's visitation rights, and respondent was motivated by his interest in continuing his relationship with his daughter, not to frustrate petitioner. |
| Decision Under Review | Appeal from the Circuit Court of Logan County, No. 13-D-41; the Hon. Thomas W. Funk, Judge, presiding. |
| Judgment | Reversed; cause remanded with directions. |

Counsel on
Appeal

Michelle L. Blackburn (argued), of Sorling Northrup, of Springfield, for appellant.

Stephanie L. Scoles (argued), of Brucker Scoles, LLC, of Clinton, for appellee.

Panel

JUSTICE APPLETON delivered the judgment of the court, with opinion.
Presiding Justice Pope and Justice Steigmann concurred in the judgment and opinion.

**OPINION**

¶ 1      Petitioner, Lindsay M. Tedrick, and respondent, Jonathan M. Tedrick, are divorced, and under the terms of the judgment of dissolution, they have joint custody of their seven-year-old child, A.T. A joint-parenting agreement, incorporated into the judgment of dissolution, designates petitioner as the residential parent.

¶ 2      In June 2014, petitioner filed a petition to remove A.T. permanently to South Carolina, where petitioner has a new job: a job that appears to be more secure and more desirable than the precarious and punishing job she had in Illinois. In August 2014, the trial court held an evidentiary hearing on the petition for removal, after which the court denied the petition, finding that the proposed removal would not be in A.T.'s best interest. Because that finding is against the manifest weight of the evidence, we reverse the trial court's judgment, and we remand this case with directions to make a new visitation schedule.

¶ 3                      I. BACKGROUND
¶ 4            A. The Judgment Dissolving the Marriage
¶ 5                   1. *Joint Custody*
¶ 6      The parties separated from one another in December 2009, and on May 29, 2013, the trial court entered a judgment dissolving their marriage.

¶ 7      The judgment of dissolution awarded the parties joint legal custody of their daughter, A.T., born on July 4, 2007, and provided that petitioner would be the "residential parent," meaning that A.T. would reside primarily with her.

¶ 8                    2. *Visitation*
¶ 9      According to a joint-parenting agreement, which was incorporated into the judgment of dissolution, respondent had the following visitation rights.

¶ 10      He had two weekends per month, coinciding with the weekends he was off work. During the school year, visitation would begin on Friday at 3 p.m. and would end on Sunday at 8:30

a.m. During the summer, when school was not in session, visitation would begin on Friday at 9 a.m. and would end on Sunday at 8:30 a.m.

¶ 11        He had Father's Day from after church until 8 p.m.

¶ 12        By mutual agreement, the parties would "equally divide [A.T.'s] birthday."

¶ 13        He had "14 days, with no more than 7 days in consecutive order, of uninterrupted periods of physical possession of the minor child each summer."

¶ 14        **B. Petitioner's Account of Her Difficulties in Her Illinois Job**

¶ 15        Petitioner testified that in June 2013, she began working for Lincoln Christian University in Lincoln, Illinois, as both the controller and the vice president of finance. She was doing the job of two persons. Not only was she in charge of all the business functions of the university, *i.e.*, budgeting, payroll, and investments, but she also managed the maintenance department, the janitorial department, and human resources. She earned $70,000 a year in this position, but she worked 60 to 70 hours a week, including nights and weekends at home–while taking care of A.T. The job was stressful and unremitting. She was expected to answer telephone calls and e-mails at all hours, and more often than not, she "slept with [her] phone or [her] computer."

¶ 16        Her relationship with the interim president of the university, Don Green, made the job even more stressful. As soon as he took over, he eliminated the jobs of her "two closest colleagues at work," the provost and the vice president of enrollment. He also eliminated the jobs of three staff employees. When petitioner expressed her concern to him that these eliminations could be detrimental to the university, he responded, " ['W]ell, we might miss you if you leave.['] " Green was urging her to hire either a controller or a vice president of finance, the two positions she was simultaneously holding. But because he no longer was involving her in any of the financial decision-making at the university, she believed his intention was to replace her and get rid of her.

¶ 17        The demands of her job at Lincoln Christian University were harming her health. She had lost 15 pounds, she was suffering from persistent migraine headaches, and she was starting to lose her hair. She was diagnosed with situational depression and was prescribed medication.

¶ 18        **C. Petitioner's New Job in South Carolina**

¶ 19        In January 2014, while still employed at Lincoln Christian University, petitioner began looking for a new job. Initially, she looked in central Illinois and in the Chicago area. She applied to a number of businesses, including Caterpillar, an accounting firm, and a Chicago hospital, but she did not apply to any college or university in Illinois (the record does not appear to reveal her reason for this exclusion). Only one of the Illinois businesses to which she had applied, a sewer equipment company in Dixon, called her in for an interview, but that company did not offer her a job. In fact, she received no offers of employment at all in Illinois.

¶ 20        So, in April 2014, petitioner began seeking employment in Georgia and South Carolina. Her preference was South Carolina. That is where her parents and her sister live. (She has aunts and uncles in central Illinois but no immediate family members there.) After being interviewed three times at the University of South Carolina, in Lexington, petitioner was offered the job of fiscal analyst in the controller's office of that university. She accepted the offer, moved with A.T. to South Carolina, and began her new job in June 2014. She and A.T. now reside in Aiken, South Carolina, with petitioner's mother and sister. Petitioner has retained her house in

Lincoln, however, pending a decision on her petition for removal. In the event her petition was granted, she would sell the house in Lincoln and move into an apartment in Lexington.

¶ 21 Petitioner earns $56,000 a year at the University of South Carolina–less than her salary at Lincoln Christian University–but she works only 37.5 hours a week, with no overtime and no telephone calls at home, enabling her to spend more time with A.T. The working environment is quiet and genial. The staff there appreciates her, and she could one day advance into the position of manager or director. She has gained back some weight. She is happier and likes her job.

¶ 22 D. Day Care for A.T.

¶ 23 1. *Before the Move*

¶ 24 Respondent's mother, Michelle Tedrick, runs a licensed day care, and until June 2014, the month of the move, A.T. was one of the children she watched. A.T. attended her grandmother's day care Monday through Friday for 1½ to 2 hours after school and Monday through Thursday from 8 a.m. to 5 p.m. in the summer. The other children in the summer day care are three or four years old, except for A.T.'s cousins, who are six and eight years old and who attend two days a week. During the school year, the ages of the children range from 3 to 10 years. When at her grandmother's day care, A.T. watched television, used her iPad, and played outside. There were no field trips.

¶ 25 2. *After the Move*

¶ 26 Since June 2014, A.T. has attended day care at Little People's Learning Center in Columbia, South Carolina, approximately 12 miles from Lexington. She is in a class of 15 children, who range from six to eight years old. She goes on field trips, reads books, and plays games. She arrives at 7:45 a.m. and leaves at 4:45 p.m.

¶ 27 E. School for A.T.

¶ 28 1. *In Lincoln*

¶ 29 From preschool through first grade, A.T. attended Zion Lutheran School in Lincoln. Petitioner was dissatisfied with that school because the first and second grades were combined and she did not think the school had done a good job educating A.T.

¶ 30 2. *In Lexington*

¶ 31 A.T. is now attending Lexington Elementary School, which has received a rating of "excellent" from the South Carolina Department of Education, and she does extracurricular activities: cheerleading camp, indoor soccer, and dance class.

¶ 32 F. Respondent's Employment

¶ 33 Respondent lives in DeWitt, Illinois, and he has worked for Exelon Corporation for the past 6½ years. Since June 2014, he has been an industrial cleaner at Exelon. His work schedule in that position is Monday through Friday, 7 a.m. to 3:30 p.m. Before being an industrial cleaner, he was a security guard at Exelon. As a security guard, he had a rotating two-week shift from 6 a.m. to 6 p.m., with Monday and Tuesday off one week and Wednesday and

- 4 -

Thursday off the next week and every other weekend off from Friday through Sunday. He applied for the position of industrial cleaner so that he could spend more time with A.T. and have a better relationship with her.

¶ 34                    G. Respondent's Use of His Visitation Rights

¶ 35    During the first six months after the dissolution of the marriage, respondent had A.T. over for weekend visitations, but she overnighted with him only once. There were two reasons why she stayed overnight with him only once during that initial six-month period: (1) she did not want to stay more than the one night, and (2) he was putting in overtime at work.

¶ 36    In 2013, respondent did not use all his visitation. He did not have A.T. over for Father's Day in 2013 (although he had her over for Father's Day in 2014). He did not use his two weeks of summer visitation in 2013, the reason being that he was working on his new residence.

¶ 37    Beginning in September 2013, however, respondent received additional visitation, over and above that stipulated in the joint-parenting agreement: he began visiting A.T. once or twice a week for a couple of hours at his mother's day care, while waiting for petitioner to arrive from work and pick up A.T.

¶ 38    He had A.T. over for two weeks in the summer of 2014, but he sent A.T. to his mother's day care from Monday to Friday of both weeks.

¶ 39    During the six months preceding the hearing (that is, from about January to July 2014), A.T. stayed with him for the entirety of the two weekends per month.

¶ 40    Since June 23, 2014, when petitioner and A.T. moved to South Carolina, respondent has used all the visitation that the joint-parenting agreement provides. For the first visit, on June 28, 2014, A.T. returned to Illinois by car. For the second visit, lasting from July 12 to 27, 2014, A.T. arrived in Illinois by airplane, unaccompanied. Flight arrangements had been made for her to return to Illinois for the weekend of August 8 to 10, 2014.

¶ 41    Respondent was concerned about A.T.'s flying unaccompanied. He also was concerned that by the time A.T. arrived at his house in DeWitt, after the flight from South Carolina and the car ride from the airport in Chicago or St. Louis, she was tired. It seemed to him that she hardly would be rested up before she had to turn around and make the long trip back on Sunday.

¶ 42                    H. The Guardian *ad Litem*'s Recommendation

¶ 43    On August 1, 2014, immediately before the evidentiary hearing, the guardian *ad litem*, Natalie N. Fulk-Marquez, filed a report, in which she recommended granting the petition for removal.

¶ 44    At the beginning of her report, Fulk-Marquez noted she was making this recommendation without having heard the parties' testimony, the testimony of their witnesses, or the arguments of counsel. Nevertheless, she had interviewed the parties and A.T.

¶ 45    Because petitioner had been the residential custodian ever since the separation in December 2009, and because the move would have benefitted A.T. by improving her mother's emotional and physical well-being and giving her mother more time to spend with A.T., Fulk-Marquez concluded that the move to South Carolina would be in A.T.'s best interest.

¶ 46        In her report, Fulk-Marquez acknowledged that A.T.'s "preference would be to stay with [respondent] in Lincoln, Illinois[,] where her friends and extended family [were] located." Even so, A.T. had a "positive" response to "the possibility of living in South Carolina and exercising visitation with [respondent]."

¶ 47        Petitioner had always "fostered the maximum involvement of both parents," and considering that petitioner had been the residential parent ever since the separation and had "always taken the lead and had greater involvement when it [came] to A.T.'s education," Fulk-Marquez thought that "it would be an even greater adjustment for A.T. to alter this dynamic in her life than it would be for her to adjust to a new location."

¶ 48                                            II. ANALYSIS

¶ 49        According to statutory law, a custodial parent has to obtain the trial court's permission before removing a child from Illinois, and whether the court grants such permission should depend entirely on the child's best interest. Section 609(a) of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/609(a) (West 2012)) provides, in part:

> "(a) The court may grant leave, before or after judgment, to any party having custody of any minor child or children to remove such child or children from Illinois whenever such approval is in the best interests of such child or children. The burden of proving that such removal is in the best interests of such child or children is on the party seeking the removal."

Thus, if removing the child from Illinois would be in the child's best interest, the court should grant the petition, and, by the same token, if removing the child from Illinois would be against the child's best interest, the court should deny the petition. The parent petitioning to remove the child from Illinois has the burden of proving, by a preponderance of the evidence, that the removal would be in the child's best interest. See *In re Parentage of Rogan M.*, 2014 IL App (1st) 141214, ¶ 5 (except to the extent that legislation requires otherwise, the standard of proof in a civil case is a preponderance of the evidence).

¶ 50        The supreme court has suggested five questions a trial court might consider when deciding whether the petitioning parent has met his or her burden of proof, and these questions are nonexclusive. First, would the removal likely improve the quality of life of both the child and the petitioning parent? Second, what are the parent's motives in requesting the removal: is the request in good faith, or is it a ruse to interfere with visitation? Third, what are the other parents' motives in opposing the removal? Fourth, what effect would the removal have on visitation? Fifth, could a realistic and reasonable visitation schedule be worked out? *In re Marriage of Collingbourne*, 204 Ill. 2d 498, 522-23 (2003). "[T]he weight to be given each factor will vary according to the facts of each case." (Internal quotation marks omitted.) *Id.* at 523.

¶ 51        We do not reweigh the competing considerations. Instead, we review the trial court's decision deferentially, and unless we find the decision to be against the manifest weight of the evidence or clearly unjust, we let the decision stand. *Id.* at 521-22. The trial court's decision is against the manifest weight of the evidence only if the evidence "clearly" calls for a conclusion opposite to that reached by the trial court or only if the factual findings on which the decision

depends are clearly, plainly, and indisputably erroneous. *Wakeland v. City of Urbana*, 333 Ill. App. 3d 1131, 1139 (2002).

¶ 52    With this deferential standard of review in mind, we will review the trial court's analysis.

¶ 53    A. Would the Removal Likely Improve the Quality of Life
of Both A.T. and Petitioner?

¶ 54    The trial court found that the move to Lexington, South Carolina, "would be of great benefit to the Petitioner" by enabling her to escape a seemingly precarious job that was injuring her health. "This situation clearly was affecting the time and energy she had available to parent," the court wrote. Although petitioner would earn $15,000 a year less at the University of South Carolina than she had earned at Lincoln Christian University, the job in South Carolina was better in every other way, and she would "have much more time to give to parental concerns."

¶ 55    The trial court further found that petitioner's search for a new job had been reasonable and in good faith and that the move to South Carolina was not a ruse to impair respondent's visitation rights, although it was "somewhat disconcerting" to the court that she had applied to no colleges or universities in Illinois. (We note, however, that in the case of *In re Marriage of Ludwinski*, 312 Ill. App. 3d 495, 501 (2000), we held that unless the custodial parent's reasons for the proposed removal were frivolous, it was irrelevant whether the parent had looked for employment in Illinois.) South Carolina was "the next most logical place" in which to look for a new job, considering that she "would have the support of her immediate family" there. The court inferred there was a "close family bond" with the mother's side of the family since, during the marriage, "the Petitioner's parents would visit [petitioner] once or twice a year and she would take [A.T.] to see them 3 or 4 times a year."

¶ 56    Even so, A.T. "ha[d] had much more interaction with the extended family of her father than [with] that of her mother." Her paternal grandmother had been her day care provider for years, and A.T. had seen her paternal grandfather at least five days a week while in her grandmother's day care. Also, respondent "would often stop by his parents' house after work to visit with [A.T.] until her mother returned from work."

¶ 57    The trial court was reluctant to subject A.T. to the amount of traveling necessary to maintain this close relationship with the father's side of the family. The court wrote:

    "Travel considerations have weighed rather heavily on the Court in making this decision. Given the long distance between the parties and the fact the child is in school, airline travel by herself seems to be the preferred option. The Court is concerned with the [e]ffect that this would have on a child of A.T.'s tender years.

    To allow the Petition, the Court would have to establish a visitation schedule which does not significantly interfere with the relationship the minor has with her father. That apparently would mean a great deal of air flight alone for A.T. The Court is not convinced that is in her best interest. Bearing the burden of this much travel alone at the age of seven does not strike the Court as something a child should be forced to do."

¶ 58    Strictly speaking, though, A.T. will not be alone. One parent will watch A.T. board the airplane, and for the two or three hours A.T. is in the air, she will be in the care of flight attendants. The other parent will be at the arrival gate and will take custody of A.T. when she disembarks. As of the date of the hearing, A.T. had made this flight at least two times,

apparently without any problem. It does not appear that, in her interview with Fulk-Marquez, A.T. expressed any concern about flying.

¶ 59 Granted, A.T. is young, and if she lives in South Carolina, visitation will mean repeated travel. Out-of-state travel can be tedious and tiring, and because Lexington is 768 miles from DeWitt, visitation necessarily will be less frequent than it was when petitioner and A.T. lived only 30 miles away from respondent, in Lincoln. We have remarked, however:

> "[I]f removal is denied every time a noncustodial parent's visitation would be modified to less frequent but longer periods, removal would likely only be granted in two unique situations. The first would be when both parents live on the Illinois border and the custodial parent seeks removal to move across the border. For example, when the parents both live in Quincy and the custodial parent wants to move to Hannibal, Missouri. The other situation would be when parents possess significant wealth and few time restraints that would allow for frequent travel." *Ford v. Marteness*, 368 Ill. App. 3d 172, 178 (2006).

¶ 60 If, as a matter of principle, no seven-year-old should be required to travel unaccompanied by his or her parent, few seven-year-olds could be removed from Illinois, because most parents have to work and lack the leisure and the funds to fly with their child for each visitation. Likewise, if the necessity of traveling back and forth for visitation were enough to defeat the proposed removal of a seven-year-old to South Carolina, no seven-year-old could ever be removed to South Carolina–or, for that matter, to any out-of-state location as far away as South Carolina. In other words, while we do not lightly gainsay the trial court, given our deferential standard of review, we are concerned that the trial court's rationale could support an almost total interdiction on the removal of seven-year-olds to any state except, perhaps, a state that borders Illinois. We live in a mobile society (*Collingbourne*, 204 Ill. 2d at 528), and it seems unlikely that the legislature intended a default position that confines custodial parents of young children to Illinois. In section 609(a) of the Dissolution Act (750 ILCS 5/609(a) (West 2012)), we see no categorical exception for young children, and the legislature must have foreseen that removing young children out of the state would necessitate repeated travel for visitation.

¶ 61 Of course, the custodial parent must have a good, honest reason for removing a young child–or, for that matter, any child–from the state. Petitioner has a good, honest reason, as the trial court found. Petitioner decided, in good faith, that it would be in A.T.'s best interest if she, petitioner, avoided a physical and emotional breakdown by exchanging a bad job in Lincoln for a good job in Lexington. The trial court could not have stopped *respondent* from moving out of Illinois. Given that a court lacks the power to compel a noncustodial parent to remain in Illinois, the interests of the custodial parent, in a removal action, should not be automatically subordinated to the interests of the noncustodial parent. *Collingbourne*, 204 Ill. 2d at 528. "[S]ome deference is due to the custodial parent who has already determined the best interests of her child[ ] *and* herself are served by *** removal. The best interests of children cannot be fully understood without also considering the best interests of the custodial parent." (Emphasis in original and internal quotation marks omitted.) *Id.* If petitioner is unemployed in Illinois, A.T.'s quality of life–and possibly her future–will suffer. Nor can petitioner be an effective parent if her health fails. The trial court was convinced that petitioner actually had no alternative but to find a new job–either she was going to be fired, or she was going to collapse emotionally or physically–and the court found she had attempted in good faith to find a job in Illinois but had failed to do so. The job offer from the University of South Carolina was a great

boon. Not only is the starting salary good, but there is a potential for promotion, and petitioner has immediate family members (a "support system") in the vicinity of Lexington. It would have been irrational for her to turn down the job at the University of South Carolina. As a responsible mother acting in her own and A.T.'s best interest, what else could she have done?

¶ 62                            B. Petitioner's Motivation in Moving

¶ 63    The trial court found that, in seeking permission to remove A.T. to South Carolina, petitioner was "motivated by the intention to better her employment circumstances and be closer to her family," not by an intention to impair respondent's visitation rights. In fact, the court found that petitioner "ha[d] made considerable effort to facilitate continued contact between the Respondent and A.T. after her move." These findings are not against the manifest weight of the evidence.

¶ 64                       C. Respondent's Motives in Opposing the Removal

¶ 65    The trial court found that, in opposing the removal, respondent was "motivated only by his interest in continuing to see his daughter as often as he [hitherto had been seeing her] and not by any intention of frustrating the Petitioner." This finding is not against the manifest weight of the evidence.

¶ 66                        D. The Effect of the Move on Visitation:
                    Whether a Reasonable and Realistic Visitation Schedule
                                    Can Be Worked Out

¶ 67    The move to South Carolina will reduce the frequency and amount of visitation. Under the joint-parenting agreement, respondent has two weekends a month. He visited A.T. at his mother's house at least twice a week, while waiting for petitioner to arrive and pick her up. Obviously, A.T. would not be able to travel to Illinois every other weekend, nor would respondent be able to stop by Lexington, South Carolina, as easily as he has stopped by his mother's house on his way home from work. So, there will be less visitation if A.T. moves to South Carolina; there is no getting around that fact. See 750 ILCS 5/609(c) (West 2012) ("The court may not use the availability of electronic communication as a factor in support of a removal of a child by the custodial parent from Illinois."). But if the prospect of a reduction in the frequency and amount of visitation were a sufficient reason to deny a petition for removal, then almost all such petitions would have to be denied. If geographical distance had to be completely neutralized before a child was removed from Illinois, no child could be removed from Illinois.

¶ 68    The question is not whether the amount of visitation would be the same before and after the move. Rather, the question is whether it would be possible to devise a visitation schedule that "preserve[s] and foster[s] the child's relationship with the [nonresidential] parent." (Internal quotation marks omitted.) *Collingbourne*, 204 Ill. 2d at 523. We are aware of no empirical evidence that the relationship between a child and the nonresidential parent grows stronger or weaker in direct proportion to the number of days the child visits the nonresidential parent. What is done with the visitation time–the quality of the time–is important, too. Of course, we do not mean to deny there can be too little visitation. We do not mean to deny that spending a reasonable amount of time with the child is crucial to the relationship and that cutting back too

much on visitation could "substantially impair the [nonresidential] parent's involvement with the child." (Internal quotation marks omitted.) *Id.* But reasonableness is the objective, not the preservation of the status quo.

¶ 69    The trial court quoted *Shinall v. Carter*, 2012 IL App (3d) 110302, ¶ 48, in which the appellate court said: "A child has an interest in maintaining significant contact with both parents following a divorce." "Significant contact," however, is not synonymous with "the same amount of contact."

¶ 70    *Shinall* also said: "When a parent has diligently exercised visitation rights, a court should be reluctant to interfere with those rights by allowing removal for unpersuasive or inadequate reasons." *Id.* Respondent has diligently exercised his visitation rights as of late, but we note that he did not use his two weeks of summer visitation in 2013 and that when he had A.T. over for two weeks in the summer of 2014, he sent her to his mother's day care from Monday to Friday of both weeks. We do not question respondent's devotion to A.T., but, realistically, we do not see how cutting back somewhat on the total amount of visitation, while making the periods of visitation longer but less frequent, would significantly impair his relationship with A.T., considering that, for whatever reasons (which, for all we know, might be legitimate), he either waived his two weeks of summer visitation or he sent A.T. to his mother's day care for most of the two weeks.

¶ 71    We further would distinguish *Shinall* by noting that, unlike the mother in that case, petitioner in the present case has a persuasive and adequate reason for requesting removal. In *Shinall*, the mother, who had been working in Illinois as a licensed practical nurse (*id.* ¶ 5), wanted to move to Colorado and take the child with her so that she could join her new husband there and be a stay-at-home mother (*id.* ¶ 8). The appellate court reversed the trial court's order granting removal. *Id.* ¶ 51. "[I]n order to prove that removal [was] in [the] child's best interest, the custodial parent [had to] prove more than his or her own desire to live with a new spouse." *Id.* ¶ 47. Also, "[t]here was no evidence presented that [the child's] having a stay-at-home mother was an improvement over her current situation of being able to see both of her parents on a regular basis and being in day care with her grandmother twice per week." *Id.* "[R]arely will the facts and circumstances in two separate removal cases be comparable." *In re Marriage of Johnson*, 352 Ill. App. 3d 605, 616 (2004).

¶ 72    As the supreme court said in *Collingbourne*, "a ruling on the best interests of a child must be made on a case-by-case basis, depending, to a great extent, upon the circumstances of each case." (Internal quotation marks omitted.) *Collingbourne*, 204 Ill. 2d at 521. The circumstances in *Shinall* are significantly different from those in the present case. For one thing, the child in *Shinall* was three years old (*Shinall*, 2012 IL App (3d) 110302, ¶ 48), whereas A.T. is seven years old. Another difference is that petitioner has a persuasive and adequate reason for wanting to move to South Carolina, as the trial court agreed.

¶ 73    To preserve and foster respondent's relationship with A.T., the trial court will have to modify the visitation schedule so as to make visitation less frequent but longer. The court was concerned about making visitation longer. The court wrote:

> "[T]o grant the Respondent sufficient visitation to maintain his bond with the minor would require long periods away from her mother during the summer months. A.T. is still at a relatively tender age, having just turned 7. Her mother, according to both parties, has been the party primarily responsible for her care. Long periods away from her mother at her age are not in her interest."

- 10 -

¶ 74 We are aware of no evidence warranting the conclusion that a long summer visitation with her father would be against A.T.'s interest. As far as we can see, both parents can provide her a safe, stable, and loving home. That was the opinion of the guardian *ad litem*, Fulk-Marquez. She interviewed A.T. in July 2014 and found that A.T. "showed no favoritism toward Mom, Dad, her paternal grandparents or maternal grandparents. She appeared to have a fondness for her entire family–on both sides." Fulk-Marquez further wrote:

> "A.T. and I discussed the possible outcomes of the trial. Her responses to the possibility of living in Lincoln and exercising visitation with Mom, and the possibility of living in South Carolina and exercising visitation with Dad were the same–positive, however when asked if she were able to choose she indicated that her preference would be to stay with Dad in Lincoln, Illinois[,] where her friends and extended family [are] located."

¶ 75 So, it appears that although A.T. leans toward residing with her father in Lincoln, she would be perfectly cheerful and content regardless of whether she lived with him in Lincoln or with her mother in Lexington. We see no disadvantage to a long visitation with him in the summer. "In all cases, removal will have some effect on visitation, but the real question is whether a schedule can be created that is both reasonable and realistic. It need not be perfect." *In re Marriage of Shaddle*, 317 Ill. App. 3d 428, 434 (2000).

¶ 76                                        III. CONCLUSION

¶ 77 For the foregoing reasons, we reverse the trial court's judgment, and we remand this case with directions to make a new visitation schedule, with liberal visitation for respondent.

¶ 78 Reversed; cause remanded with directions.