2021 IL App (2d) 200765-U
No. 2-20-0765
Order filed April 12, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF ERIC J. SCHOUTEN, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Petitioner-Appellee, | ) ) | |
| and | ) ) | No. 17-D-1863 |
| NATALIYA S. SCHOUTEN, | ) ) ) | Honorable Robert E. Douglas, |
| Respondent-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices McLaren and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Trial court's denial of petition to relocate was not contrary to the manifest weight of the evidence.  Affirmed.

¶ 2    In 2018, respondent, Nataliya Schouten, and petitioner, Eric Schouten, divorced. Presently, Nataliya appeals the trial court's order denying her petition to relocate the parties' daughter, S.S., to Florida.  For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. Dissolution

¶ 5    In 2005, the parties married, and, in 2011, S.S. was born.  In 2017, almost immediately

after Eric petitioned for dissolution, Nataliya's mother falsely accused him of sexually abusing S.S. Although the allegations were ultimately found to be meritless, Eric's parenting time was affected for around three months, with Eric being unable to see S.S. for a period.[1]

¶ 6    On May 17, 2018, the court dissolved the parties' marriage and, pursuant to the parenting agreement, Nataliya is the primary caretaker. Eric has parenting time every Thursday after school, alternating weekends from Thursday after school until the start of school on Monday, as well as alternating weeks in the summer. In practice, however, the alternating summer weeks did not work well, so the parties agreed instead to maintain the every-other-weekend schedule throughout the entire year.

¶ 7                        B. Hearing on Petition to Relocate

¶ 8    On August 9, 2019, Nataliya, pursuant to section 609.2 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/609.2 (West 2018)), petitioned to relocate to Florida with S.S. On August 13, 2019, the court appointed John Demling (a retired family-court judge) to serve as the guardian *ad litem* (GAL). In September 2019, Eric objected to the relocation.

¶ 9    On July 10, and August 7, 2020, the court held hearings on Nataliya's petition. Nataliya testified that, in March 2017, she met and fell in love with Phillip Drake, who lives in Tampa, Florida. They are engaged to marry. Nataliya—who received the equivalent of a juris doctorate degree in the Ukraine, passed the bar exam in New York, and holds an L.L.M. degree—has worked in Chicago as a paralegal for Baker & McKenzie and Bosch, where she primarily performed discovery. A cancer survivor, Nataliya testified that the long hours required by global law firms

---

[1] After the false accusations were resolved, Nataliya's mother was ordered to have no contact with S.S. and she returned to the Ukraine.

were detrimental to her health and her ability to parent S.S. and, so, she began searching for new employment. During the pendency of these proceedings, she accepted a position "running the [electronic discovery] department" for Fidelity Information Services ("FIS"), a company based in Tampa. The salary is around $20,000 less than what she earned in her previous position, but she explained that the position was beneficial for both personal and professional reasons, as it was flexible and was in her niche. Due to the COVID-19 pandemic, Nataliya has been working remotely from Illinois. When asked if she would be allowed to continue to work remotely if the court denied the relocation petition, Nataliya responded that she did not know. She was concerned, however, that it would be difficult to do so, as she would be leading a team and doing so without a physical presence might prove challenging. If both the petition were denied and she was no longer permitted to work remotely, she would seek alternate employment. Nataliya agreed that, if the FIS position had been located in a state other than Florida, she would not have applied for it.

¶ 10    According to Nataliya, as compared to S.S.'s current public elementary school, there is a private school in Tampa that has smaller class sizes, numerous clubs, and an international program that would benefit S.S. in becoming a "global citizen." If the petition were denied, Nataliya testified that she might consider moving from Carol Stream to Oak Park or another suburb and would explore other private school options that provide the "global citizen" curriculum.

¶ 11    Overall, Nataliya and Eric have cooperated with each other concerning parenting time, modifications thereto, etc. For example, due to her compromised immunity and Eric's employment working with patients as a chiropractor, they agreed that S.S. would stay exclusively with Nataliya for around 10 weeks during the COVID-19 pandemic and quarantine period. During that time, Eric and S.S. enjoyed socially-distanced porch visits, and Nataliya installed applications on devices to allow S.S. and Eric unfettered and frequent access. Eric and S.S. would talk

frequently through those applications, sometimes for almost one hour. Nataliya testified that, if allowed to relocate, she would continue to work diligently on maintaining S.S.'s relationship with Eric, which she viewed as important, and offered generous parenting time to him if relocation were granted, including all school vacations, the entire summer, open doors to come to Florida and stay in their home any time he wished to visit, and a travel allowance.

¶ 12    Nataliya testified that, historically, Eric often could not pick up S.S. from school on his scheduled Thursdays due to his work schedule, and, so, either she or Eric's parents would instead pick up S.S. Eric's parents would care for S.S. on Thursdays after school, doing homework with her and feeding her dinner, and Eric would not get home until around 7 p.m., which left little time for him to spend with S.S., who had an 8 p.m. bedtime. In addition, Nataliya testified that there were several Saturdays where Eric's work schedule left him unable to care for S.S., so either she or Eric's parents or girlfriend would cover for him. Nataliya asserted that Eric altered his work schedule to be fully present for S.S. only after she filed the relocation petition. She also testified that, as S.S.'s primary caregiver, she alone has been responsible for tasks such as taking S.S. to the doctor.

¶ 13    Phillip testified that he works as a paralegal for a Tampa-based, family-law firm. He is proficient in Florida law and has been with the same firm for 14 years. If the petition to relocate were denied, Phillip would move to Illinois and seek employment, although, unless he acquired a position in the city of Chicago, which would involve a commute and less time at home, he anticipated making a lower salary in Illinois. Phillip's mother, father, brother, niece and other extended family live near him in Florida, and he acts as his mother's primary caretaker, assisting her multiple times per week with things like groceries, doctor's appointments, and medication. Phillip testified that, if relocation were denied, he would still marry Nataliya.

¶ 14    Eric testified that he lives in St. Charles with his parents (although during COVID-19, he moved in with his girlfriend, with whom Nataliya has no quarrels). He objects to the relocation because he is afraid that the move will affect S.S.'s relationship with him. He explained that, although Nataliya offered long periods of visitation, "constancy and consistency" were also very important. Further, with his job, it would not be very practical or sustainable to suggest that he could frequently fly to Florida for visits, and for him to uproot and move would also be difficult because Florida has different chiropractic licensure requirements. According to Eric, contact through phone applications works only as a "place holder." Eric testified that, as she grew older, S.S. might not want to frequently travel to Illinois for long periods and leave her friends and activities, so that would put S.S. "in a bad spot" and it would be unfair to burden her with that struggle.

¶ 15    Eric is a clinical director and treating chiropractor for Integrated Physical Medicine Center in Roselle. He disagreed with Nataliya's characterization of his work schedule. He explained that he was instrumental in opening a new clinic location, so it was initially difficult for him to leave work early on Thursdays; however, once that clinic was up and running, he modified his Thursday schedule as soon as possible. As such, Eric testified that he now leaves work at 3 p.m. on Thursdays and that he does not presently work on Saturdays. Previously, if he worked on Saturday, it was for no more than two hours and, on rare occasions, there were community events on Saturdays requiring his presence. Eric testified that, when S.S. is in his care, they have family dinners with his parents on Friday nights, and he performs normal parenting tasks, such as taking her to activities, shopping, getting dressed (as has been age appropriate throughout the years), and that he has volunteered at her school and attends parent-teacher conferences. He feels that S.S.'s

educational needs are being very well met at her current school, as is reflected by her standardized test scores, and that a private school is unnecessary.

¶ 16    The GAL testified that he met with S.S.'s parents in his office and in their respective homes. S.S., age eight, was present during the home visits, but it was the GAL's opinion that she "is really too young at this point in time to have what I would consider a meaningful conversation with respect to moving or not moving." As such, he observed S.S.'s interactions with each parent. The GAL also reviewed S.S.'s school records, met with Eric's parents (with whom he lived at the time), and he twice interviewed Phillip and also met with him in person. Commenting that it was a somewhat close case, the GAL ultimately recommended that the court deny the petition to relocate. He assessed the factors discussed by the supreme court in *In re Marriage of Eckhart*, 119 Ill. 2d 316, 326-28 (1988), as well as the 11 factors set forth in section 609.2(g) of the Act (750 ILCS 5/609.2(g) (West 2016)), finding as follows:

| 750 ILCS 5/609.2(g) Factors | GAL's Findings |
|---|---|
| 1. Circumstances and reason for relocation | "This is all about the marriage." While there is a job change at issue that involves more satisfaction for Nataliya and is, therefore, important, the job change is a tangential issue. If it had not been for the engagement to marry, there would be no intent to relocate. |
| 2. Reasons for objecting to relocation | Eric's motive for objecting concerns the frequency of visitation, as opposed to the totality of time. This is particularly important here, where Eric lost time with S.S. due to the false allegations against him. Given S.S.'s young age and the totality of the case's history, the GAL opined that it is in S.S.'s best interest to create a parenting schedule that allowed Eric frequent visitation, which was more important here than the total duration of the visitation. |
| 3. History and quality of each parent's relationship with child and whether a parent has substantially failed or refused to exercise the parental responsibilities allocated under the parenting | S.S. and Nataliya are very closely bonded, and S.S. has a closer relationship with Nataliya than Eric. Eric exercises his visitation, and while his parents help, as does his girlfriend, the GAL did not see that as a negative. Although young and not knowing the specific reasons for it, S.S. is aware that, for a period, she did not see Eric, which might have impacted the closeness of their relationship. The GAL also noted that |

| judgment | Phillip is a "net plus," understands his future role and boundaries as a stepparent very well, and the GAL found nothing negative in that relationship. |
|---|---|
| 4. Educational opportunities at each location | The GAL had compared S.S.'s Illinois public school with Tampa public schools and found them comparable. He later found out about the Tampa private school and investigated it. While smaller class size is a positive, it was the only advantage the GAL saw, as compared with the Illinois public school. |
| 5. Presence or absence of extended family at each location | The GAL noted that Eric has extended family in the Chicago area, whom S.S. sees regularly. He noted that Phillip has extended family in Tampa area. |
| 6. Anticipated impact of the relocation on the *child* | The GAL found this factor difficult to assess. He found that relocation would have no direct benefits on S.S. However, there would be indirect benefits, in that she is extremely close to Nataliya and Nataliya would be "much happier" in Florida, would probably have a better quality of life, and that would be the primary, indirect benefit of relocation for S.S. |
| 7. Whether the court will be able to fashion a reasonable allocation of parental responsibilities between all if relocation occurs | The GAL again noted that, in this case, he believed that frequency of visitation was more important than duration, given S.S.'s age and, in particular, as she grows older. "Right now[,] we may be able to fashion some type of a visitation or parenting time. Clearly, as S.S. matures, gets into junior high and high school, she is going to have her own desires with respect to travel and taking sort of time off in one location to move to another location. That is going to be very, very difficult. As it is in all relocation cases." Although technology could be used, the GAL did not find it a substitution for in-person parenting time. |
| 8. Wishes of the child | Again, the GAL believed that, as she still wished to please both parents, S.S. was too young to adequately formulate and relate her wishes. |
| 9. Possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and developmental level of the child | The GAL found this factor neutral and that parental responsibilities could be exercised in long distances. |
| 10. Minimization of the impairment to the parent-child relationship caused by relocation | The GAL noted some concern that, with respect to S.S.'s grandmother, Nataliya had followed the court's order that the grandmother have no contact with S.S. However, Nataliya still had her own frequent contact with her mother. He was slightly concerned that, if relocation occurred, enforcing the order that S.S. have no contact with her grandmother might be more difficult. |
| 11. Any other relevant | A parent's happiness impacts the child, and Nataliya's move |

| | |
|---|---|
| factors bearing on the child's best interests | would indirectly benefit S.S. There would be no direct harm to S.S. However, it would likely be detrimental to S.S.'s relationship with Eric. |

¶ 17          C. Court's Ruling on Petition to Relocate and Motion to Reconsider

¶ 18     On September 8, 2020, the trial court denied the petition to relocate. In its written decision, the court noted, in introductory remarks, that the case was difficult because both parents love S.S., they both cooperate and have a good relationship in terms of caring for her, and neither was motivated by ill or malicious intent. It commented that, "[w]hat this case boils down to is a mother who has found her dream life and, in the words of a once popular song, 'is gonna follow that dream wherever that dream may lead.' In following her dream, she seeks to make it her daughter's dream as well." The court then made its own section 609.2(g) findings:

| 750 ILCS 5/609.2(g) Factors | Trial Court's Findings |
|---|---|
| 1. Circumstances and reason for relocation | Favors relocation. The petition is not motivated by nefarious intent. Rather, Nataliya and Phillip have a strong relationship and wish to marry. The commitment to marry Phillip is the only reason for the relocation: "Were it not for Phillip, there would be no request to relocate to Florida. If Phillip lived in any other state, that is where she would be requesting to relocate." Further, "Nataliya cites her job opportunity and educational possibilities as reasons for the relocation, but none of these are unique or would even exist without Phillip." |
| 2. Reasons for objecting to relocation | Favors denial of relocation. Eric has pure motives for objecting. He argues relocation will adversely affect his relationship with S.S., and he wants to maintain a *frequent* relationship with S.S. The court expressly found invalid Nataliya's argument that Eric has not exercised all parenting opportunities and relies on his parents to cover for him when his employment interferes with parenting time. Further, the court recalled that, earlier in the case, Eric's parenting time and, to some degree, his relationship with S.S. were affected by the false accusations made against him by Nataliya's mother. "Since that time[,] Eric has worked diligently on his relationship with his daughter. Nataliya acknowledges that the time Eric spends with their daughter is quality time and she has no criticism of his time with [S.S.]" |

| 3. History and quality of each parent's relationship with child and whether a parent has substantially failed or refuse to exercise parental responsibilities allocated under the parenting judgment | Neutral. The court agreed with the GAL's assessment that there is unquestionably a strong bond between Nataliya and S.S. Eric's bond with S.S., while not as strong as Nataliya's, may have been affected by the abuse allegations from 2017. Despite Nataliya's assertions and its finding of some evidence contradicting the frequency of Eric's Saturday work schedule, the court did not find significant shrinking in parenting time resulted from Eric's work schedule, nor did he find Eric abdicated parental responsibilities when he received help from his parents or girlfriend, all of whom Nataliya acknowledged were positive influences on S.S. "It is the norm for families to have two working parents and if the utilization of daycare during parenting time was [the] lynch pin upon which a relocation was determined, then virtually every relocation petition would be granted." |
|---|---|
| 4. Educational opportunities at each location | Neutral. The court agreed with the GAL's assessment that the advantages Nataliya touted regarding the Florida elementary school were also available in Illinois, nor was there evidence that S.S.'s Illinois school was providing a substandard education. In fact, Nataliya testified that, if relocation were denied, she would find in Illinois a school with a program similar to that in Florida. |
| 5. Presence or absence of extended family at each location | Favors denial of relocation. S.S. has grandparents, aunts, and uncles in Illinois on Eric's side of the family, with whom she has an existing relationship and frequently sees. She has no extended family on Nataliya's side, either here or in Florida. While S.S. would gain a "new" extended family and an additional support network through Phillip's family, "it is not equivalent to her blood relatives who reside predominately in close proximity to Chicago." |
| 6. Anticipated impact of the relocation on the *child* | Neutral to slightly favors denial of relocation. "The beneficial impact from the relocation can be derived as easily in Illinois as in Florida." Nataliya and Phillip will live in Illinois, if relocation is denied. As such, S.S. will derive the benefit of a two-parent/adult household, even if she stays in Illinois. The court agreed with the GAL that, if relocation were granted, Eric's relationship with S.S. would be impacted. He would no longer have day-to-day contact of the sort he has now, and the court again agreed with the GAL that larger periods of time do not make up for the more frequent interaction that Eric currently enjoys. |
| 7. Whether court will be able to fashion a reasonable allocation of parental responsibilities between all if relocation occurs | Favors denial of relocation. The court found that it could fashion an allocation of responsibilities, but it would not be reasonable. Although Nataliya had been genuinely generous in her offer of parenting time, Eric would still become the "occasional parent." The court found that, in order to spend |

| | |
|---|---|
| | time with Eric, S.S. would be forced out of her "new comfort zone" and would have to leave her friends and activities for longer-than-normal periods. "This is not in her best interest. At the end of the day, this is not about the convenience of Eric in seeing his daughter but about the best interest of his daughter in having her dad around on a frequent consistent basis." |
| 8. Wishes of the child | The court did not conduct an *in camera* interview with S.S., and accepted the GAL's findings that, given her desire to please both of her parents, S.S. is too young to express a reasoned opinion as to relocation. |
| 9. Possible arrangements for exercise of parental responsibilities appropriate to the parents' resources and circumstances and developmental level of the child | Neutral to slightly favors relocation. The court acknowledged that Eric could utilize digital communication, and that joint parental decisionmaking could be exercised from a distance. |
| 10. Minimization of the impairment to the parent-child relationship caused by relocation | Favors denial of relocation. The court found that, although Nataliya testified "truthfully and earnestly" that she would diligently work to foster and promote a relationship between Eric and S.S., nothing could make up for the fact that Eric would be far away and will be "relegated to a back-seat position in his daughter's life." |
| 11. Any other relevant factors bearing on the child's best interests | The court stated, "There is no doubt that Nataliya would be happier in Florida and that happiness will impart a benefit to [S.S.] Nataliya has testified to being more satisfied in her new job despite its $20,000.00 decrease in salary. She has been doing her job remotely from Illinois for some time and there is no evidence other than her opinion that she will not be able to continue doing so in the future. [Phillip] will be a positive influence on [S.S.] in the event of relocation, but he testified that the same will be true if relocation is denied, as he will move to Illinois. There is no indication that, given his skills, [Phillip] could not obtain employment in Illinois if relocation were denied." |

¶ 19 Nataliya moved the court to reconsider. On November 18, 2020, the court denied the motion. Nataliya appeals.

¶ 20 II. ANALYSIS

¶ 21    On appeal, Nataliya argues that the trial court erred in denying the petition to relocate. First, Nataliya argues that it was against the manifest weight of the evidence for the court to find that Nataliya sought to make moving to Florida "her daughter's dream," because the GAL never spoke with S.S. about relocation. Indeed, citing *In re Marriage of Tedrick*, 2015 IL App (4th) 140773, she argues that the GAL *should* have spoken to S.S. about her thoughts, and he failed to explain how or why S.S. lacked the ability to have a meaningful conversation about the topic. Similarly, Nataliya argues the court's reasoning that, if relocation were granted, S.S. would be forced out of her new comfort zone and would have to leave her friends for long periods to spend time with Eric, was not based on any record evidence. Second, Nataliya argues that the court erred by not considering the indirect benefits that the relocation would have on S.S., by virtue of Nataliya's own increased happiness in Florida, her better quality of life there, a better career opportunity, "increased quality of medical care for Nataliya," better weather, good schools, and that Phillip was viewed as a "net plus" for Nataliya and, by extension, S.S. Third, Nataliya argues that the court's findings under section 609.2 of the Act were contrary to the manifest weight of the evidence, pointing specifically to Eric's alleged failure to exercise parental responsibilities, the measures she was willing to take to allow him generous quality parenting time, its finding that there was no benefit to S.S. in Florida that was not available in Illinois, and that Eric's reasons for objecting were to "maliciously interfere."

¶ 22    In 2016, the General Assembly enacted section 609.2 of the Act, codifying the factors a court must consider when ruling on a petition for relocation. 750 ILCS 5/609.2 (West 2018). By and large, our supreme court had previously developed these factors through case law, holding that, in making a best-interest determination, the factors must be considered and balanced by the trial court, with no one factor controlling. See *In re Marriage of Collingbourne*, 204 Ill. 2d 498,

523 (2003); *Eckert*, 119 Ill. 2d at 326-28. In deciding whether relocation is in the child's best interests, the trial court must consider the following 11 factors:

"(1) the circumstances and reasons for the intended relocation;

(2) the reasons, if any, why a parent is objecting to the intended relocation;

(3) the history and quality of each parent's relationship with the child and specifically whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment;

(4) the educational opportunities for the child at the existing location and at the proposed new location;

(5) the presence or absence of extended family at the existing location and at the proposed new location;

(6) the anticipated impact of the relocation on the child;

(7) whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs;

(8) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to relocation;

(9) possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child;

(10) minimization of the impairment to a parent-child relationship caused by a parent's relocation; and

(11) any other relevant factors bearing on the child's best interests." 750 ILCS 5/609.2(g) (West 2018).

¶ 23    The party seeking judicial approval of the proposed relocation must establish by a preponderance of the evidence that the relocation is in the child's best interests. See *Eckert*, 119 Ill. 2d at 325. A determination of the child's best interests cannot be reduced to a simple bright-line test, but, rather, must be made on a case-by-case basis, depending to a great extent upon the circumstances of each case. *Id.* at 326. A trial court's determination of what is in the child's best interests should not be reversed unless it is contrary to the manifest weight of the evidence. *Id.* at 328. A court's decision is contrary to the manifest weight of the evidence only where the opposite conclusion is clearly apparent or where its findings are unreasonable, arbitrary, or not based on the evidence presented. *Best v. Best*, 223 Ill. 2d 342, 350 (2006). "We do not reweigh the competing considerations. Instead, we review the trial court's decision deferentially, and unless we find the decision to be against the manifest weight of the evidence or clearly unjust, we let the decision stand." *Tedrick*, 2015 IL App (4th) 140773, ¶ 51. Here, the trial court's findings were not contrary to the manifest weight of the evidence.

¶ 24    While we understand Nataliya's rationale and motivation for seeking relocation, we reject her arguments on appeal. In essence, they ask us to reweigh pieces of evidence or to dissect the court's findings in isolation, as opposed to considering how the challenged findings impacted the court's collective assessment of all the evidence, as applied within the statutory framework.

¶ 25    First, Nataliya argues that it was against the manifest weight of the evidence for the court to find that she sought to make moving to Florida "her daughter's dream," because the GAL never spoke with S.S. about relocation. This argument misses the mark. We do not believe that the court was even relying on the GAL's testimony when it made the remark, we find no fault in the GAL's discretionary assessment that an eight-year-old child, who seeks to please both parents, would not be adequately equipped to offer a meaningful opinion on the matter, and we do not believe that,

even if S.S. had been consulted and had expressed a desire to move, her position alone would have tipped the scales in favor of relocation. Nataliya's reliance on *Tedrick* is misplaced. There, the GAL spoke to a seven-year-old child about her wishes, but it does not in any way stand for the proposition that a GAL should do so or, more broadly, that an eight-year-old child is necessarily old enough to offer an opinion concerning relocation. See *Tedrick*, 2015 IL App (4th) 140773, ¶ 74. In addition, we agree with Eric that the court's comment, which we note was simply made in introductory remarks but not in its assessment of the statutory factors, was speaking more to the fact that a *parent's* desire to marry and relocate does not alone suffice to show it is in the *child's* best interest, than it was seeking to comment on S.S.'s preferences or lack of evidence thereof.

¶ 26     Similarly, Nataliya argues the court's reasoning that, if relocation were granted, S.S. would be forced out of her new comfort zone and would have to leave her friends for long periods to spend time with Eric, was not based on any record evidence. However, there would be no need for such direct evidence: it is a logical and reasonable inference from the record. Nataliya had proposed that Eric have visitation with S.S. on every school vacation and for the entire summer. As such, it stands to reason that the proposed visitation schedule, in contrast to an every-other-weekend visit with Eric, would require S.S. traveling a long distance for long periods. She would be doing so after assimilating to a new environment in Florida and, hopefully, after developing new friendships and local interests. That this situation would possibly play out negatively for S.S., particularly as she grew older, was not an unreasonable inference.

¶ 27     Relying on *Collingbourne*, Nataliya argues that the court erred by not adequately considering the indirect benefits the relocation would have on S.S., by virtue of Nataliya's own increased happiness in Florida, her better quality of life there, a better career opportunity, "increased quality of medical care for Nataliya," better weather, good schools, and that Phillip was

viewed as a "net plus" for Nataliya and, by extension, S.S. We disagree. Indirect benefits to the child by virtue of the parent's happiness are extremely important, but Nataliya's argument fails because both the court and GAL *did* consider the import of Nataliya's happiness and the significant indirect benefits that would flow to S.S. therefrom. Further, although she expressed concern and speculation about it, Nataliya presented no *evidence* that she would lose her "better career opportunity" if relocation were denied. Nor did she present any evidence to support her assertions of better medical care or better weather, both of which are somewhat subjective concepts. In addition, the evidence reflected that the *primary* benefits at issue, *i.e.*, marriage to a man she loved and the "net gain" that Phillip would bring to Nataliya and S.S. by virtue of joining their household, would come to fruition even if relocation were denied. As such, when viewing the evidence in its totality and balancing *all* factors, the court reasonably allowed S.S. the proverbial "best of both worlds," allowing her to acquire the benefits that Nataliya's marriage to Phillip would bring, while avoiding potential disruption to her relationship with Eric. Although Nataliya argues that the court did not place *enough* emphasis on the indirect benefits to S.S., "[w]e do not *reweigh* the competing considerations." *Tedrick*, 2015 IL App (4th) 140773, ¶ 51.

¶ 28    Nataliya argues that the court's findings under section 609.2 were contrary to the manifest weight of the evidence, pointing specifically to Eric's alleged failure to exercise parental responsibilities, the measures she was willing to take to allow him generous quality parenting time, its finding that there was no benefit to S.S. in Florida that was not available in Illinois, and that Eric's reasons for objecting were to "maliciously interfere." Again, when assessing S.S.'s best interest, the court must consider and balance all of the factors, with no one factor being controlling. As such, we disagree with Nataliya that Eric's historic work conflicts on Thursdays or Saturdays reflected a failure to regularly exercise his parental rights and that any such failure was so

significant that it should have weighed more heavily in the court's overall assessment of the evidence. The court specifically considered Nataliya's arguments on this point, noted the evidence did reflect that Eric sometimes worked during his time with S.S., but did not find *significant* shrinking in parenting time resulted. Overall, the court heard evidence that Eric sought to limit work conflicts, and it did not agree that, when work conflicts arose, they reflected an attempt by Eric to shirk parental responsibilities. To be blunt, the evidence here simply does not clearly reflect a parent with a track record for shirking his responsibilities.

¶ 29 Moreover, there is absolutely nothing in the record suggesting that Eric harbored any malicious intent by objecting to the petition. To the contrary, both the GAL and the court agreed that Eric's intentions were simply to maintain frequent interaction with his daughter, *particularly* given the history of the case and the impact that the earlier false accusations against Eric might have had upon their relationship. Nataliya does not dispute that Eric and S.S. have a good relationship. We also note that the evidence is uncontroverted that S.S. is young and that her bond with Nataliya is extremely close. As such, (and although not found by the trial court, raised on appeal, or in any way dispositive to our decision) we simply note that, even if the court were to agree that longer periods with Eric (such as all vacations and the entire summer) might have benefited the father-daughter relationship, long periods *away* from Nataliya, S.S.'s lifelong primary caregiver, when viewed in the totality of the evidence, might *not* have served S.S.'s best interest.

¶ 30 In sum, we reject Nataliya's arguments. It is simply not clearly apparent that the court's conclusion was incorrect.

¶ 31                                III. CONCLUSION

¶ 32 For the reasons stated, the judgment of the circuit court of Du Page County is affirmed.

¶ 33    Affirmed.