NOTICE

Decision filed 01/27/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220573-U

NO. 5-22-0573

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| BROOKE A. MILLER, | ) | Union County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 15-D-25 |
| | ) | |
| RANDALL MILLER, | ) | Honorable |
| | ) | Timothy D. Denny, |
| Respondent-Appellee. | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Barberis and McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court's decision denying the petitioner mother's motion to relocate with the minor children is reversed where the decision was against the manifest weight of the evidence.   We remand with directions for the trial court to make a new allocation of parenting time, with liberal time for the respondent father.

¶ 2    This appeal arises out of an order denying a motion to relocate with the minor children filed by the petitioner, Brooke M.  On appeal, Brooke M. argues that the trial court's decision denying her relocation with the children was against the manifest weight of the evidence.  For the reasons that follow, we reverse and remand with directions.

1

¶ 3                                    I. BACKGROUND

¶ 4      The respondent, Randall M., and Brooke M. were married on September 1, 2001, and had two children, E.M., born November 9, 2007, and A.M., born August 27, 2010, during the marriage. On April 17, 2015, Brooke M. filed a petition to dissolve the parties' marriage. That same day, the parties entered into a marital settlement agreement (MSA), resolving issues of property division, child custody, and parenting time. On April 22, 2015, the trial court entered a judgment for dissolution of marriage, which incorporated the MSA. On May 7, 2021, Brooke M. filed a petition for rule to show cause based on Randall M. having an arrearage of $35,600 in child support. On May 19, 2021, the court issued a rule to show cause. On October 1, 2021, Randall M. filed a motion to modify the MSA, requesting that the child support payments be reduced.

¶ 5      On March 11, 2022, Brooke M. filed a notice of relocation, indicating her intent to move to Cedarburg, Wisconsin, in June 2022. She also filed a petition seeking the trial court's permission to relocate with the children. She had been offered employment at Concordia University in Mequon, Wisconsin, as the director of the physician assistant (PA) program, and she would earn approximately $40,000 more in annual income. In the petition, she argued that the educational and cultural opportunities were greater for the children in Cedarburg, which is where she intended to reside; the relocation would offer the children better stability and an improved environment; and a reasonable parenting time schedule could be arranged that was in their best interests.

¶ 6      On May 23, 2022, the trial court held a hearing on the petition to relocate. At the beginning of the hearing, Brooke M.'s attorney informed the court that the hearing would only focus on the relocation issue as discovery had not been completed on the child support issues. Her attorney explained that Brooke M.'s new employment started on July 1, so it was important that the

relocation issue be decided. Then, the following testimony was presented. Brooke M. testified that she had two children with Randall M., E.M., who was 14, and A.M., who was 11. She currently lived in Makanda, Illinois, with the children, and Randall M. exercised his parenting time with them on most Thursday nights and every other weekend. Although he was also entitled to parenting time during the summer for two weeks, he never utilized that time.

¶ 7 Brooke M. was currently employed as an assistant professor at the Southern Illinois University (SIU) Carbondale PA program and the residency program. She also worked part-time as a PA at the SIU School of Medicine and owned an Airbnb in Cobden. She earned approximately $120,000 per year. She sought to relocate to Cedarburg, Wisconsin, because she was recruited by Concordia University in Mequon, which was about 10 minutes from Cedarburg, for a program director position. She had not been actively looking to leave the southern Illinois area; they contacted her about the job. She would be the program director of the PA program as well as an associate professor. The new employment would be a promotion for her, and her salary would increase by at least $40,000 annually (her base salary would be $160,000 per year). The school also agreed to pay off her student loan debt (those payments would be $600 per month for five years). There were also opportunities for advancement as she would be in line for the dean position. There were no opportunities for advancement to program director at her current employment. However, she could advance to a professor at SIU within five years. Although she could work a clinical job as a PA in the southern Illinois area and potentially make more money, she would not have the same flexibility as she did in academia.

¶ 8 Brooke M. testified that she took the children to Cedarburg to visit and to tour the school to see if they were interested in moving there. She invited Randall M. to go with them, but he did not go. After visiting, the children were very excited about the opportunities at the school and

3

expressed that they wanted to move. Cedarburg was approximately a six-hour drive from Cobden, and she believed that Champaign would be a good halfway point to meet for parenting time exchanges. After meeting with the recruiter, talking with the children, and visiting the area, she accepted the job in March and gave her current employer notice.

¶ 9 Brooke M. testified that she provided all of the financial support for the children and being in a better financial position would be beneficial for the family. Although Randall M. was ordered to pay $600 per month in child support, he was at least five years in arrears. He claimed he was morally opposed to paying child support. Also, he had not consistently maintained health insurance for the children as required.

¶ 10 Brooke M. testified that she currently took the children to school and picked them up, except for when Randall M. was exercising his parenting time. She had flexibility at her current employment, which was why she went into academia. However, her clinic hours at Concordia University would be even more flexible, and she would not have to work in the summer like she did at SIU. She would also still have the flexibility to transport the children to and from school every day. She would have no set work schedule there, except for when she was teaching classes. There were busier times of the year that would require her to be at the school more, but her teaching load would be less because she would also be doing administrative work. The children did not require a babysitter, but the school had after school programming if necessary.

¶ 11 Concordia University was surrounded by several towns, and Cedarburg was one of those towns; it was a small town with a population of 11,000. Brooke M. acknowledged that Cedarburg might be considered a northwestern suburb of Milwaukee, but she did not think so; it was about 15 minutes to Milwaukee. The children chose the Cedarburg school because it was the number one school district in Wisconsin, and there were more opportunities there for them. In researching

4

the various school districts, Brooke M. explained that Wisconsin had an entity, which was similar to the Illinois Board of Education, that ranked the schools in Wisconsin, so she looked at the entity's rankings and also looked at the top school districts' websites to see what opportunities were offered. She acknowledged that the rankings changed annually, so Cedarburg school district might not be number one any longer, but the school had great class offerings that appealed to the children and their talents. She wanted the children to look at schools that had opportunities that did not exist in southern Illinois. The children exceled at mathematics, science, engineering, and robotics.

¶ 12    The children currently attended school in Cobden. Their school offered a couple of computer classes, but the Cedarburg school had 12 to 16 computer classes, such as app development and cyber security. Brooke M. noted that those classes would normally only be available at the college level in southern Illinois, and they were the classes that the children were interested in. The Cedarburg school also had several clubs that paired with the course offerings, such as robotics club, engineering club, and language clubs. Although Cobden had Spanish club, there were more opportunities that appealed to the children at the Cedarburg school. There were also athletic opportunities offered there that were not offered in Cobden. They offered more advanced classes in mathematics and breakout rooms where students went for additional help. She believed that the high school and grade school averaged 17 students per faculty member. Cobden did offer classes where a student could receive dual credit, but the class size determined the course offerings. Although the children would be attending separate schools because E.M. was going into high school, the two schools were connected. The high school intentionally dismissed earlier, so the high school students could pick up their siblings at the grade school.

5

¶ 13	The children were in favor of the move and had made pros and cons lists about it, talked about it with their friends, and had started looking through their personal belongings to get rid of items they no longer needed. They also talked about learning to snowboard and being in a ski club and had looked through tourism brochures to find things they wanted to do in Wisconsin. A.M. also wanted to participate in hockey. Brooke M. explained that she would never move solely for employment; the children were excited about the new opportunities, and she believed that it was in their best interests. She noted that, although it was not without difficulty, she and the children were overall excited about the move.

¶ 14	Brooke M. acknowledged that she did not have any family living in Cedarburg, and she believed that it was important for the children to maintain a relationship with their extended family. Her father and sister lived in southern Illinois, and she also had extended family there. The children saw her sister and nephew approximately once every two months, and they were regularly around her father. Randall M.'s parents also lived in southern Illinois, and, since Randall M. lived with his parents, the children saw their grandparents every time they had an overnight with him. They saw their uncles and aunts on Randall M.'s side on holidays. Randall M. had a sister who lived in Rockford that they saw a few times each year and a sister who lived in St. Louis and had children that E.M. and A.M. were close to, so they saw them more often.

¶ 15	Brooke M. offered to share the transportation with Randall M., so he would be able to exercise his parenting time with the children, and the children would be able to see their extended family in southern Illinois. The children also had phones, so they could text or FaceTime with Randall M. She was not opposed to Randall M. having the children on three-day weekends and for him to have extended parenting periods during the summer and at Christmas break or spring break. She also offered to maintain the every other weekend schedule, but she acknowledged that

6

it would be difficult for the children. She noted that she and Randall M. had always been able to work out holidays and any other parenting time issues, and she did not believe that the move would prevent him from maintaining his close relationship with the children. She wanted to make sure that the children regularly saw him and their extended family.

¶ 16    Brooke M. kept a calendar of the children's activities and the parenting time schedule. In 2022, she noted that Randall M. exercised approximately 52% of his available parenting time. They had always been flexible with each other regarding parenting time, and he occasionally saw the children on days that were not his regular parenting time, but he never took the children for additional overnights. They shared parental decision-making authority, and they worked well together in making decisions concerning the children. She believed that, even with the move, it was possible for them to continue working together when making decisions for the children. She offered to have Randall M. visit Cedarburg, tour the children's schools, and meet the guidance counselors, so he would feel more comfortable about the potential move.

¶ 17    Randall M. testified that he lived in Anna, Illinois, and he owned a coffee roasting company in Cobden. He traveled to St. Louis, Missouri; Paducah, Kentucky; Peoria, Illinois; and Champaign, Illinois, for work to meet with vendors. His current schedule allowed him to spend time with the children during the day because they could come to his work. He started the company because E.M. had food allergies that had initially required frequent intervention. E.M. was allergic to tree nuts, peanuts, eggs, and milk, and he went into anaphylaxis with milk, so there were instances where he had to go to the emergency room, or they had to administer an EpiPen. Brooke M. moved the children to the Cobden school because it was peanut free. They also had to be careful about what restaurants they ate at; there were certain ones in town that they knew were safe.

7

¶ 18   Randall M. had a very good relationship with his children, and he saw them every Thursday, every other weekend unless there was some kind of sporting event or activity, and they sometimes visited him at work.  He explained, that before the COVID-19 pandemic, he saw the children almost every day because he picked them up from school or they visited him at work.  He further explained that Brooke M. and the children used to live across the street from his work, but in January 2021, they moved into a new house.  His children were great students, and E.M. was in scholar bowl.  A.M. was doing shot put and running track, and Randall M. went to all his track meets.  He loved spending time with his children, he believed that it was important for a father to show up for his children, and he wanted to make sure that he was there for them.

¶ 19   Randall M. testified that he was opposed to the relocation because he believed that a father's influence was important, and he was concerned about moving his children out of a situation where they were solidly based and putting them into a situation where the outcome was uncertain.  He was also concerned about the influence of a more urban society and the children having difficultly fitting in.  He explained that A.M. easily made friends, but E.M. was quiet and timid, so he was more concerned with E.M.'s well-being in a new situation transitioning from junior high to a freshman in high school.  However, he was not worried that their academic performance would suffer in Cedarburg; he believed that they would excel there.  He did not doubt that Cedarburg was a good school, but he wanted to be around to support his children and felt they needed to be around their father on a regular basis.

¶ 20   Randall M. testified that, if Brooke M. was allowed to relocate with the children, it would be very difficult for him to attend their extracurricular activities while also maintaining his employment.  He also noted that the travel would be expensive.  However, he would be able to leave his employment during the week as long as he got all of his work done.  He did not have any

8

family living in Cedarburg, although he had a niece who lived in Madison. He might also have to incur hotel expenses, but he might be able to stay with his sister in Rockford. He currently lived with his parents, so the children saw them on a weekly basis, and they were very close to his mother. They were also really close to his youngest sister's children.

¶ 21 Randall M. married in December 2021, and his wife lived in London. He had a good relationship with her. Since the marriage, he had made four trips to London. She had made approximately five or six trips to southern Illinois, and he picked her up from the airport in Chicago. When traveling to Chicago, he either stayed at his sister's house in Rockford or at a friend's house in Peoria. He incorporated those personal trips with his business meetings with vendors. He acknowledged that it would be possible for him to schedule his vendor meetings in Champaign to coincide with the parenting time exchanges. However, it would be a burden because his delivery schedule was according to his vendor's needs.

¶ 22 Randall M. testified that he had a great relationship with Brooke M., and they worked very well together. He acknowledged that, if she was allowed to move, he did not believe that their relationship would change, and they could continue working together. He also believed that the children would excel anywhere.

¶ 23 Brooke M. was then recalled to testify and disagreed with Randall M.'s testimony that he was seeing the children more pre-pandemic. She explained that, in terms of overnights, the schedule had been pretty consistent for the last few years. The children did, however, see him more when they lived across the street from his work, and he did pick them up from school more frequently when they were younger. She acknowledged that he tried to make it to as many of the children's activities as possible.

9

¶ 24    On June 3, 2022, the trial court entered an order, denying Brooke M. permission to relocate with the minor children.  In the order, the court considered the relevant factors set forth in section 609.2(g) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/609.2(g) (West 2020)) and made the following findings.  The court found that the reason for Brooke M.'s relocation was a new job opportunity, which would increase her salary from $120,000 per year to $160,000 per year, and Randall M. did not dispute that the new employment was a legitimate and positive career opportunity.  As for Randall M.'s objections to the relocation, the court found that Randall M. was passionate in his belief that it was important for the children to have their father in their lives, the children were doing very well in their current setting, they had extended family support there, their current school was minutes away from Randall M.'s business, and there was no information presented on the resources available in the new location to accommodate E.M.'s food allergies.  The court also found that the move would make it difficult for Randall M. to have any regular involvement in the children's lives.

¶ 25    The trial court noted that Randall M. currently saw the children every Thursday night and every other weekend, and he attended most of the children's extracurricular activities.  Before the COVID-19 pandemic, he saw the children almost every day.  Although Brooke M. testified that Randall M. was only using 52% of his available parenting time, the court found that this was not specified, and it was apparent that recent moves and the pandemic disrupted the family routine.  The court noted that it was not willing to say that parenting time disruption during the pandemic was a substantial or willful refusal to exercise parenting time.  The court also noted that, in its experience, a noncustodial parent exercising parenting time every Thursday and every other weekend was making a diligent effort to be involved in the children's lives.  Although Brooke M.

10

alleged that Randall M. was not current on child support, the court noted that those allegations were not fully developed or presented, so they were not considered for the relocation decision.

¶ 26    The trial court noted that, although Brooke M. testified about many educational opportunities available in the new location, there was no evidence provided whether similar activities were available in southern Illinois. The court found that subjective, nonverified hearsay testimony about the new school promoting itself as the number one school in Wisconsin provided little useful information to determine which school district was in the children's best interests. The court noted that it must consider that any opportunity for extracurricular involvement would be substantially diminished by the amount of time the children would be traveling to southern Illinois. The court also noted that the children were engaged in many extracurricular activities in Illinois, the Cobden school district was highly regarded as a quality school in the community, and both parties agreed that the children were excelling in their current school.

¶ 27    As for extended family, the trial court noted that all of the living grandparents lived in the southern Illinois area and saw the children on a fairly regular basis and most of the extended family lived near southern Illinois. The court noted that there was no family living in or around Cedarburg, so there was no familial support network there for the children. In their current location, the children were doing well in school and engaged in positive extracurricular school and non-school activities, such as sports and church. They had a relatively well-balanced relationship with both of their parents and all of their living grandparents. The court noted that the impact of the move was difficult to predict but that moving them from a rural area to a suburb of Milwaukee would change their lifestyle and would remove them from their entire support network. While Brooke M.'s income would be higher at her new job, the court found that her work hours were uncertain. Thus, the court found that the evidence did not support a finding that moving the

11

children, who were doing well in their current location and had an extended support network, was in their best interests.

¶ 28    As for fashioning a parenting plan, the trial court noted that Cedarburg was 455 miles and approximately seven hours from southern Illinois. Using the Internal Revenue Service's travel reimbursement rate, the court calculated that the cost of round-trip travel would be $532, and the net family cost for a weekend visit would exceed $1000, noting that this would not include food or any necessary hotel accommodations. The court also noted that the consequence of a weekend exchange was that the children would spend a minimum of 13 hours in a vehicle. Thus, the court found that exchanges for even long weekends would be financially and logistically impractical; the move would effectively remove Randall M. from the children's lives; any attempt at regular parenting time would eliminate any financial benefit from the move; and any regular parenting time would eliminate the children's opportunities to participate in extracurricular activities, such as clubs, sports, and church. The court further found that neither party was able to propose a workable parenting plan, and it was unable to fashion a practical plan.

¶ 29    As for the children's preferences, the trial court noted that they did not testify, so there was no evidence of their preferences. Regarding any impairment of the children's relationship with Randall M., the court noted that Randall M. currently saw the children every Thursday, every other weekend, holidays, special events, and school events, and the move would essentially cut him out of any regular parenting time and out of any participation in school and/or activities. The court stated that Zoom and FaceTime were not substitutes for a parent seeing their children and spending time with them on a regular basis. The court noted that Brooke M. could move to Wisconsin, which would make Randall M. the primary custodial parent, and she could use technology for her parenting time.

12

¶ 30    The trial court also considered E.M.'s severe allergies, noting that he was integrated into an educational setting, had a familial support network, and was familiar with the resources available locally. The court found that a transition to a new home, educational setting, and medical professionals, with no known accommodations, was a factor that must be considered.

¶ 31    The trial court found that Randall M. testified with great enthusiasm about children needing their father, and it agreed that the children were best served with the support of both loving parents and support of extended family. Although the parties coparented relatively well, a move of this nature would come at great risk. The court noted that Randall M.'s testimony focused on how difficult the move would be for the children and on his concerns that the children be well rounded. He was intimately familiar with E.M.'s special medical and dietary needs and in tune with the challenges this caused the family. The court noted that his passion for his children and his desire for what was in their best interests was genuine and made a substantial impression. Thus, after considering the testimony and the relevant statutory factors, the court found that it was in the children's best interests to deny Brooke M.'s relocation request.

¶ 32    On June 30, 2022, Brooke M. filed a motion for reconsideration of the trial court's denial of her request to relocate. In the motion, she argued, in pertinent part, that evidence of Randall M.'s significant child support arrearage should have been presented and considered at the relocation hearing and that the court's failure to hear this evidence placed her at a disadvantage, which resulted in her not having a fair trial. She also argued that the court erred in disregarding her testimony about the Wisconsin educational system as subjective, hearsay statements. She contended that the court also erred in finding that the children would be moved to a metropolitan area, that any financial benefit of having an increased salary would be removed by the travel costs, that her new work schedule was unknown as the evidence indicated that she would have a flexible

13

schedule, and that E.M.'s allergies could be impacted by the move. She further contended that there was no evidence presented that the parties could not continue to coparent and make joint decisions regarding parental responsibilities if the relocation was granted, and her uncontroverted testimony demonstrated that Randall M. did not exercise all of his available parenting time.

¶ 33     After hearing the arguments made by counsel at the August 24, 2022, hearing on the motion to reconsider, the trial court denied the motion. In making this decision, the court noted that this was a civil case, and an ineffective assistance of counsel argument was not applicable, regardless of merit; that counsel for both parties decided not to proceed on the child support issue due to the time-sensitive nature of the relocation issue; that it believed almost everything Brooke M. said in the hearing, and the Cedarburg school was a likely a fine school; and that it had no doubt that her new employment was good employment.

¶ 34     However, the trial court noted that there was no evidence offered that the proposed school and community were better than Cobden. There was also no evidence presented about the medical community in Cedarburg or evidence that compared the standards of living. The court also noted that it would cost money to transport the children from Wisconsin to Illinois every other weekend, and traveling to Chicago a few times each year was not the same as driving to Wisconsin every other weekend. The court found that the children would not be able to take advantage of any opportunities in Wisconsin because they would be in southern Illinois every other weekend. The court stated that its biggest issue was that neither side presented a practical parenting time plan and that most petitions to relocate resulted in one parent being cut out of the children's lives. The court noted that it did not consider Randall M.'s failure to exercise all of his parenting time as substantial since he was seeing them every other week and trying to participate. Thus, the court announced it was denying the motion. Brooke M. appeals.

14

¶ 35                                    II. ANALYSIS

¶ 36    Brooke M. contends that the trial court's decision denying her relocation with the children was against the manifest weight of the evidence. A parent who has been allocated a majority of parenting time or equal parenting time may seek to relocate with the minor children. 750 ILCS 5/609.2(b) (West 2020). If the nonrelocating parent objects to the proposed relocation, the other parent must file a petition seeking the trial court's permission to relocate. *Id*. § 609.2(f). In adjudicating a relocation petition, the court must make its determination based on the best interests of the children. *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 32.

¶ 37    Section 609.2(g) of the Act enumerates the following best-interests factors a trial court should consider when making this determination: (1) the circumstances and reasons for the relocation; (2) the reasons, if any, why a parent is objecting to the relocation; (3) the history and quality of each parent's relationship with the child and specifically whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him under the parenting plan or allocation judgment; (4) the educational opportunities for the child at the existing location and at the proposed new location; (5) the presence or absence of extended family at the existing location and at the proposed new location; (6) the anticipated impact of the relocation on the child; (7) whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs; (8) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to relocation; (9) possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the child's developmental levels; (10) minimization of the impairment to a parent-child relationship caused by a parent's relocation; and (11) any other relevant factors bearing on the child's best interests. 750 ILCS 5/609.2(g) (West 2020).

15

¶ 38    The parent seeking relocation has the burden of proving, by a preponderance of the evidence, that it is in the child's best interests. *In re Marriage of Tedrick*, 2015 IL App (4th) 140773, ¶ 49. The best-interests determination must be made on a case-by-case basis depending, for the most part, on the circumstances of each case. *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 32. A trial court's best-interests determination should not be reversed unless it is clearly against the manifest weight of the evidence, and it appears that a manifest injustice has occurred. *Id.* A trial court's determination is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence. *Banister v. Partridge*, 2013 IL App (4th) 120916, ¶ 47. It is not the function of a reviewing court to reweigh the evidence. *In re Marriage of Elliott*, 279 Ill. App. 3d 1061, 1065-66 (1996).

¶ 39    Here, the trial court determined that relocating to Wisconsin was not in the children's best interests. With the deferential standard in mind, we will review the court's analysis of the best-interests factors by addressing each one in turn.

¶ 40                    A. Reasons for Intended Relocation

¶ 41    Brooke M.'s reason for the intended relocation to Wisconsin was a new employment opportunity that would increase her salary from $120,000 to at least $160,000 per year. There was no dispute that this was a legitimate and positive career opportunity for Brooke M.

¶ 42                    B. Reasons for Objecting to the Relocation

¶ 43    The trial court considered Randall M.'s reasons for objecting to the relocation, noting that he believed it was important for the children to have a father in their lives, the children were doing well in their current setting and had extended family support, and the move would make it difficult

16

for him to have any regular involvement in their lives. There was no dispute that his objections were genuine and sincere and that he wanted to be regularly involved in his children's lives.

¶ 44        C. The History and Quality of the Parents' Relationship With the Child

¶ 45    Randall M. currently saw the children every Thursday night, every other weekend, and when they visited him at work. He also attended their extracurricular activities whenever possible. However, Brooke M.'s undisputed testimony revealed that he never exercised his two-week vacation period with them during the summer. Although Brooke M. testified that she kept track of the actual parenting time exercised by Randall M. in 2022, and he had only used 52% of his available time, the trial court found that there was no specific testimony presented about this calculation. The court also found that the COVID-19 pandemic and recent move disrupted the family routine and his parenting time. However, Brooke M.'s testimony focused on Randall M.'s failure to exercise all of his allocated parenting time in 2022, after the COVID-19 restrictions had eased.

¶ 46    Also, in denying relocation, the trial court did not consider Brooke M.'s allegations that Randall M. was in arrears in his child support payments, noting that the allegations were not fully developed since they were being addressed in later proceedings. At the relocation hearing, Brooke M. testified that, although Randall M. was ordered to pay $600 per month in child support, he was at least five years in arrears, and he had stated that he was morally opposed to paying child support. He also had not consistently maintained health insurance for the children. Unlike the trial court, who dismissed the undisputed testimony about Randall M.'s failure to satisfy his financial obligations to his children, we find that this is an important consideration to evaluate when determining the best interests of the children. This is especially important when allowing relocation would allow Brooke M. to earn at least $40,000 more annually and would provide her

17

with greater opportunities for career advancement, which would be beneficial to the minor children because it would improve their quality of life. Also, Brooke M.'s testimony revealed that her new employer agreed to pay off her student loan debt, which would result in an extra $600 per month for five years for the family.

¶ 47                                   D. Educational Opportunities

¶ 48     The trial court noted that Brooke M. testified about the many educational opportunities available within the proposed school district but failed to provide any evidence of whether similar activities were available in southern Illinois. The court also noted that, although Brooke M. testified that the new school promoted itself as the number one school in Wisconsin, subjective, nonverified hearsay provided little useful information when determining which school district was in the children's best interests. The court then went on to note that Cobden was a quality school and that both parties agreed that the children were excelling in their current educational setting. The court found that any opportunity for extracurricular involvement would be substantially diminished by the amount of time the children would be traveling to see the noncustodial parent.

¶ 49     After carefully considering the record, we note that there was some testimony provided about the differences in educational opportunities between the current school and the proposed school. Brooke M. testified about the many educational opportunities offered at the proposed school, such as the class offerings that appealed to the children, and the various clubs that paired with those class offerings. She testified that the children were interested in mathematics, science, engineering, and robotics, and, while the Cobden school offered a couple of computer classes, the Cedarburg school had 12 to 16 computer classes, including app development and cyber security. The Cedarburg school also had more advanced classes in mathematics. She noted that those classes would normally only be available at the college level in southern Illinois. There were also

18

athletic opportunities offered in Cedarburg that were not offered in Cobden and breakout rooms at the school where the students could get additional help. She noted that, although Cobden did offer classes where the students could receive dual credit, the course offerings were determined by class size, so there was no guarantee that the children would be interested in the offered classes.

¶ 50    Moreover, Randall M. agreed that the Cedarburg school appeared to be a good school, and he believed that the children would excel regardless of what school they attended. As for extracurricular activities, there was no reason that the parenting time schedule could not take into consideration any extracurricular activities that the children wanted to participate in, especially where the parties had a history of being flexible with parenting time.

¶ 51                                E. Extended Family

¶ 52    The trial court found that all of the living grandparents resided in the southern Illinois area; they saw the children on a fairly regular basis; most of the extended family was also in that area; and there was no family in or around the Cedarburg area, so there was no familial support network there for the children. There is no dispute that the children would not have any extended family living in Cedarburg or the surrounding areas. However, Randall M. testified that he had a sister who lived in Rockford and who was close to the children, and he had stayed with her at times when traveling to Chicago. He also lived with his parents, so the children would presumably see them when he exercised his parenting time.

¶ 53              F. The Anticipated Impact of the Relocation on the Child

¶ 54    The trial court found that the evidence did not support a finding that moving these children who were doing well in their current setting and had an extended support network in their current location was in their best interests. The court noted that the children had a relatively well-balanced relationship with their parents and grandparents and were engaged in positive extracurricular

19

school and non-school activities. The court found that Brooke M.'s work hours were not certain and that the change in lifestyle that would occur by moving the children from a rural area to a Milwaukee suburb had to be considered.

¶ 55    We agree with the trial court that the impact of the children moving to Wisconsin cannot be predicted. However, both parents testified that the children would excel regardless of where they lived and attended school. Also, the parties had a history of working well with each other, even through this litigation and the litigation of the child support issues, and there is no reason to suspect that would change if Brooke M. was allowed to relocate with the children to Wisconsin. In fact, Randall M. even testified that he had a great relationship with Brooke M., and he did not anticipate that it would change upon relocation. As for Brooke M.'s work schedule, there was no evidence presented as to a specific schedule, but she did testify that her clinic hours would be more flexible at Concordia University, she would not have to work during the summer like she did at SIU, and she would still have the flexibility to transport the children to and from school. Also, she testified that Cedarburg had a population of 11,000, and, although it might be considered a suburb of Milwaukee, there was no evidence presented that the children would be living in Milwaukee.

¶ 56                    G. Reasonable Allocation of Parental Responsibilities

¶ 57    The trial court found that neither party was able to propose a workable parenting time plan. The court also found that any regular parenting time would effectively remove Randall M. from the children's lives, would eliminate any financial benefit of the move because a weekend visit would exceed $1000 per visit, and would eliminate any opportunity for the children to participate in extracurricular activities.

¶ 58    If removal was denied every time a noncustodial parent's parenting time would be modified to less frequent but longer periods, then removal would likely only be granted in two unique

20

situations: when both parents live on the Illinois border, and the custodial parent seeks removal to move across the border or when parents possess significant wealth and few time restraints that would allow for frequent travel. *Tedrick*, 2015 IL App (4th) 140773, ¶ 59. Removal will always have an impact on parenting time, but the relevant question is whether a reasonable parenting time schedule can be created that would preserve and foster the children's relationship with the nonresidential parent. *Id.* ¶ 68; *In re Marriage of Repond*, 349 Ill. App. 3d 910, 919 (2004).

¶ 59 We acknowledge that Randall M.'s parenting time would likely have to be reduced in frequency as continuing with the current parenting time schedule and allowing him time every other weekend would be difficult to maintain for the children and both parties. However, at the relocation hearing, Brooke M. testified that she was not opposed to Randall M. having extended time during the holidays, spring/winter break, and summer break because she wanted to make sure that the children were regularly able to see him and his family. Based on the record before us, there was no reason to doubt that she would be willing to work together with Randall M. to allow him as much time with the children as possible to preserve and foster his relationship with them. Moreover, with regard to the concern that the travel expenses could cancel out any increased income, we agree that the travel could be costly. However, Randall M. testified that he routinely traveled to Springfield, Peoria, and Champaign for work, and some of his vendor meetings could coincide with the parenting time schedule. He also had a sister living in Rockford, who he had previously stayed with when traveling to Chicago.

¶ 60                                  H. The Children's Wishes

¶ 61 The children did not testify at the relocation hearing, and no *in camera* interviews were requested. However, Brooke M. testified that the children were excited overall about the move, and they were in favor of it. The children had visited the area and the school and made pros and

21

cons lists about the relocation; they were excited about the opportunities there; they had started talking to their friends about it; and they had started making plans for activities that they wanted to do there.

¶ 62                              I. Exercise of Parental Responsibilities

¶ 63    The trial court found that no possible arrangements were presented, and it could not contemplate a workable solution in this case. Although the court is correct that no specific arrangement was presented at the hearing, that does not mean that there is no workable solution. There is no reason why Randall M. could not be involved in decisions regarding the children's schooling or in handling any issues that may arise from a distance. Based on the parties' history and their testimony, we are confident that the parties will continue working together to effectuate the joint decision-making and parental responsibilities of their children. If the noncustodial parent must be in close proximity to be involved in exercising joint decision-making authority, then relocation would never be allowed, except where that parent was completely absent.

¶ 64            J. Minimization of Impairment to the Parent-Child Relationship

¶ 65    The trial court found that the move would essentially cut Randall M. out of any regular visits with the children and out of any participation in school and/or activities. Although the move would likely not allow him to attend as many extracurricular and/or school activities as he currently is able to attend, there is no indication that he would essentially be cut out of that part of his children's lives. Also, as previously noted, Randall M.'s parenting time could be modified to less frequent but longer time periods with the children to make sure that he gets quality time with them. The parties have always worked well together when making decisions that are in the best interests of the children, and there is no reason to believe that would change.

¶ 66        K. Other Relevant Factors Bearing on the Children's Best Interests

¶ 67    The trial court found that a transition to a new home, educational setting, and medical professionals with no known accommodations for E.M.'s food allergies was a factor to consider. The court also found that the children were best served with the support of both loving parents and their extended families, and a move of this nature would come with great risks. The court also found impactful Randall M.'s genuine desire for what was best for the minor children. We agree with the trial court that the children are best served by having the support of both loving parents and that Randall M. is genuinely concerned about his children and wants what is best for them. However, there is nothing in the record to suggest that by moving to Wisconsin, the children would no longer have the loving support of both parents. Brooke M. testified that she wanted to make sure that the children were regularly able to see Randall M. and his extended family and wanted them to maintain their close relationship with him. Based on her history with being flexible with the parenting time schedule, regardless of any issues with child support and health insurance, there is no reason to doubt her testimony.

¶ 68    Also, E.M.'s food allergies have been a lifelong issue; this is not an issue that was recently discovered. Brooke M., who is a medical professional, is aware of E.M.'s dietary needs and restrictions, and there is no indication in the record that she would place him in an environment that would be harmful or that could not adequately accommodate his needs. In fact, the reason the children were moved to the Cobden school was because it was better able to accommodate E.M.'s needs.

¶ 69    The trial court ultimately decided that relocating to Wisconsin was not in the minor children's best interests. In reviewing the court's decision, we are mindful that we must not substitute our judgment for that of the trial court. However, after carefully considering the record

23

and the trial court's findings based on the statutory factors, we conclude that the trial court's decision to deny the petition to relocate was against the manifest weight of the evidence. Thus, we reverse the judgment of the circuit court and remand with directions to make a new allocation of parenting time, with liberal parenting time for Randall M. Because we reverse the court's relocation decision, we do not need to address Brooke M.'s remaining argument that the trial court erred in denying her motion for posttrial relief.

¶ 70                                III. CONCLUSION

¶ 71     For the foregoing reasons, we reverse the judgment of the circuit court of Union County, and we remand this case with directions to make a new allocation of parenting time, with liberal parenting time for Randall M.


¶ 72     Reversed; cause remanded with directions.