2024 IL App (2d) 240219-U
No. 2-24-0219
Order filed August 19, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF<br>MEGAN K. NORRIS, | ) <br> ) <br> ) | Appeal from the Circuit Court<br>of Kendall County. |
| Petitioner-Appellant, | ) <br> ) | |
| and | ) <br> ) | No. 18-D-288 |
| JEFFREY NORRIS, | ) <br> ) | Honorable<br>Carlo D. Colosimo, |
| Respondent-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Jorgensen and Mullen concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The trial court did not err in granting the respondent's petition for relocation.

¶ 2     The petitioner, Megan Norris, appeals from the judgment of the circuit court of Kendall County granting the motion of the respondent, Jeffrey Norris, to relocate with the parties' four children to Washington.  We affirm.

¶ 3                                   I. BACKGROUND

¶ 4     The parties were married in 2004.  Four children were born to the parties: Z.N. (born in 2007), J.N. (born in 2008), A.N. (born in 2010) and S.N. (born in 2012).  In 2018, Megan filed a

petition for dissolution. The trial court appointed Attorney Michael Blake to serve as guardian *ad litem* (GAL) for the children. On February 4, 2020, the parties entered an agreed parenting plan granting the parties joint decision-making responsibilities for the children and designating Megan as the primary residential custodian. Jeffrey had parenting time every other weekend and a couple days during the week. The trial court entered a judgment for dissolution on the same date as the parenting plan.

¶ 5    On April 28, 2020, about two months later, Jeffrey filed a verified petition to modify the parenting plan. In that petition, he alleged that circumstances had changed because the children were seriously endangered while in the custody of Megan. He also alleged that he had recently filed an order of protection on behalf of one of the children, and cited an incident where J.N. hit Megan with a frying pan. He requested that he be granted sole decision-making responsibility with respect to the children's education, medical treatment, religious activities, and extracurricular activities. He also requested that the parenting schedule be modified in accordance with the best interests of the children. Thereafter, the trial court reappointed the same GAL that represented the children during the dissolution proceedings.

¶ 6    On May 11, 2021, Jeffrey filed an emergency petition to temporarily suspend and restrict parenting time. Jeffrey stated that Megan's boyfriend, John Gerstel, had moved into the family residence and the children did not feel comfortable living with him. Jeffrey alleged that Megan did not respond to the GAL's requests for information concerning Gerstel. The trial court granted the petition.

¶ 7    On September 23, 2021, the trial court entered an agreed order whereby Jeffrey withdrew his April 2020 petition and the parties agreed to certain modifications of the parenting plan. Specifically, Jeffrey was granted sole decision-making responsibility regarding the children's

education, medical treatment, religious upbringing, and extracurricular activities. Jeffrey was also designated as the legal custodian of the children for school purposes. Megan's parenting time was to be supervised by an agreed-upon neutral third party with the dates and times of such visitation to be determined later. Gerstel was barred from having any contact with the minor children. Megan was granted reasonable and regular electronic communication with the children on cell phones to be provided by Megan. Finally, the agreed order specified that the children were to remain in counseling.

¶ 8 During the above proceedings, Megan was represented by various counsel. On January 7, 2022, the trial court granted the motion to withdraw filed by the attorney representing Megan. A week later, Megan filed an appearance to represent herself *pro se*. At that time, there was a pending motion filed by Jeffrey to modify child support. Megan subsequently filed petitions related to alleged violations of the marital settlement agreement and Jeffrey filed a petition for rule to show cause regarding child support.

¶ 9 On March 14, 2023, an attorney filed a notice of limited-scope appearance to represent Megan on "Post-Decree matters related to the hearing on 3/15/2023 and matters related to Child Support and Allocation of Parental Responsibilities/Parenting Time." The record indicates that there was a hearing on March 15, 2023, related to the various petitions filed by each party. Following the hearing, the trial court entered an agreed order that allowed Megan's child support arrearage to be offset with an amount Jeffrey owed her under the marital settlement agreement. The parties also reached agreement on other asset-related issues.

¶ 10 On December 8, 2023, Megan's limited-scope attorney filed a motion to modify the allocation of parental decision-making responsibilities and parenting time. In that motion, Megan

requested unsupervised visitation and joint parental decision-making responsibility for the children. Jeffrey later filed a response to the motion.

¶ 11    On January 10, 2024, Jeffrey filed a notice of intent to relocate. Jeffrey alleged that on January 9, 2024, he learned that the house he was renting was being sold and he needed to move out by March 1, 2024. He was unable to find affordable housing in Illinois but would be able to do so in Washington because his parents and extended family lived there. He planned to temporarily move into a four-bedroom house owned by his parents.

¶ 12    On January 19, 2004, Megan filed an appearance to represent herself *pro se* and an objection to the notice of relocation. On January 22, 2024, the trial court reappointed the same GAL to investigate the issues related to allocation of parenting time and relocation and to provide a verbal report of his findings. Because Megan objected to the relocation, Jeffrey subsequently filed a petition for leave to relocate with the children, as required by section 609.2(f) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/609.2(f) (West 2024)). Megan filed a *pro se* response to the petition for relocation.

¶ 13    On February 1, 2024, Megan's limited-scope attorney filed a motion to withdraw. On February 13, 2024, the trial court granted the attorney's motion to withdraw and Megan was "granted 21 days to obtain further counsel or to appear *pro se*."

¶ 14    At a hearing on February 20, 2024, the GAL gave his findings. The children were ages 17, 15, 13, and 11 years old. The GAL stated that the children's relationship with Megan was very "splintered." He opined that, if removal was granted, there would have to be a way for Megan to have "some sort of time" with the children. The GAL recommended reconciliation counseling between Megan and the children before she was allowed to have unsupervised visitation. He spoke with the children's two counselors, who stated that counseling was terminated with the consent of

both parents because the counselors did not feel that counseling was having any value because the two younger children were not engaging, and the two older children did not want to go anymore. The GAL acknowledged that, at one point, the children were having joint counseling with Megan, but noted that it had not happened recently. The GAL stated he had developed a rapport with the children over the years. He believed that they trusted him and were honest when they spoke with him. He stated that three of the four children told him that they were not interested in reconciliation with Megan. When questioned by the trial court, Megan stated that the last time she had counseling with the children was in summer 2023. At the conclusion of the hearing, the trial court stated that it wanted one of the children's therapists to opine on whether reunification therapy could occur long distance or whether it would prevent relocation. The trial court noted that the only date it had open for a hearing on relocation, prior to March 1, was the next day.

¶ 15    On February 21, 2024, the trial court held a hearing on the petition for relocation. At the outset, Megan stated that she did not have enough time to adequately prepare for the hearing and she was not given a full 21 days to retain new counsel. The trial court stated that it was hearing the petition for relocation on an expedited basis because of the time constraints involved due to the requirement that Jeffrey and the children move out of their residence by March 1.

¶ 16    Jeffrey testified that J.N. had lived with him since February 2021 and the rest of the children had been living with him since May 2021. J.N. moved in because there was a lot of conflict between Megan and J.N., and the police had been called numerous times. J.N. had been violent with Megan. Jeffrey testified that there had been no incidents of domestic violence since J.N. moved in with him. Since September 2021, Megan had eight supervised visits with the children. Three or four of those were within the last six months. Jeffrey testified that, after all the children were living with him, Megan was ordered to pay $700 per month in child support. However, a

later court order offset the child support payments against a debt that Jeffrey owed to Megan under the marital settlement agreement. Under that order, Megan did not have to pay child support until April 2025. Jeffrey testified that he was thus raising the children without child support.

¶ 17    Jeffrey testified that, around January 5, 2024, his landlord told him the residence was being sold and Jeffrey needed to move out. Jeffrey searched for other places to live in Illinois but could not find anything affordable. He worked with two realtors and searched Facebook Marketplace. He earned about $55,000 per year and it would cost about $2000 per month to rent a three-bedroom house in the area. If allowed to move to Washington with the children, he could move in with his parents, who lived in a four-bedroom house on two acres. The girls would share a room, the boys would share a room, and he and his parents would have their own rooms. The children had visited the home five or six times since the divorce. He had siblings in the area so the children would be surrounded by aunts, uncles, and cousins. His parents would be able to help with childcare and schoolwork and get the children to extracurricular activities. Jeffrey testified that statistics from the bureau of education ranked the school districts in Washington significantly higher than the Illinois school districts that the children were currently attending. Jeffrey submitted an exhibit showing the rankings for each school district.

¶ 18    Jeffrey testified that he was an IT consultant and that, through family and friends, he had several consulting opportunities available to him in Washington. He acknowledged that he did not have any formal job offers in Washington and that he would not sign any contracts until he was sure that he could relocate. He currently had clients all over the Chicagoland area and it was possible he would lose some clients if he moved to Washington. Jeffrey acknowledged that, if he worked late, most of the children were old enough to be home alone.

¶ 19    Jeffrey testified that he had developed a strong relationship with the children over the last few years.  He offered to pay airfare for Megan to fly to Washington twice a year to visit the children.  The children currently communicated with Megan electronically and they could continue to do so from Washington.  He had no intention of interfering with Megan's communication with the children.  Only one of the four children (A.N.) expressed any reservation about moving to Washington, and the reason was because she would miss her friends.  He believed that a move to Washington would not change the status quo as the children could continue electronic communication with Megan, which was currently the main method of communication with her while living in Illinois.  The supervised visitation was generally spotty, and it normally stressed the children out.

¶ 20    Jeffrey also acknowledged that Megan had joint counseling with the children for "a while" or "for the better part of the year" until counseling ended in July 2023.  He also testified that Megan attended concerts and football games, but noted that she sometimes brought Gerstel, in violation of the agreed order.  J.N. told Jeffrey he was bothered when Gerstel showed up to a football game.  Jeffrey also testified that, sometimes when the children were talking to Megan on the phone, the conversation was on speaker phone and Gerstel was yelling at the children in the background.  Jeffrey testified that he tried to foster a good relationship between Megan and the children, and he often spoke about her good qualities and the happy times they had together as a family.  He testified that he intended to encourage them to have a relationship with Megan and participate in reunification therapy.

¶ 21    The GAL testified that J.N. wanted to move, Z.N. would like to move but was "iffy on it," A.N. did not want to leave her friends but was okay with moving, and S.N. was indifferent.  He stated that, to sum it up, J.N. wanted to go and the other children were okay with either result.  J.N.

did not want to have any contact with Megan. One of the children told the GAL that Megan had not called in months. Another was upset because the Christmas presents from Megan did not arrive until January. The consensus among all of them was that Megan did not want to be involved. None of the children wanted to have any contact with Megan's boyfriend, Gerstel. The GAL noted that, since his last involvement in the case, the children seemed to be accustomed "to the tension that's involved in their lives, and have *** gotten used to it." The GAL opined that J.N. and Z.N. still carry a significant amount of anxiety stemming from the divorce. The GAL agreed that, if relocation was granted and Megan was allowed to contact the children daily, she could have as much interaction with them as she presently had in Illinois. The GAL opined that regular electronic contact between Megan and the children could be more beneficial than piecemeal face-to-face visits.

¶ 22    The GAL further testified that counseling was necessary to mend the relationship between J.N. and Megan. He stated that remote reconciliation counseling "could occur" but noted that one of the family's prior counselors said that she does not like to, and would not, do remote reconciliation counseling. The GAL opined that reconciliation counseling would be more effective in person. The GAL acknowledged that the counseling had ceased because "the kids just weren't into it." The GAL agreed that it was possible that the kids were not interested in counseling because they would rather be doing other things. The GAL stated that the counselors he spoke to acknowledged that Megan had participated in some counseling with the children, but it was not clear as to how long her participation lasted.

¶ 23    Megan testified that she spoke with various therapists, and they all agreed that reconciliation therapy would be better in person. She performed a search on Zillow and found 134 rentals in Jeffrey's price range in the northern Illinois area. If Jeffrey was worried about distance,

a drive to Ottawa was still closer than Washington. Either way, the children would have to change schools, but attempts at reunification would be more successful if they stayed in Illinois.

¶ 24   Megan further testified that her interaction with the children was being mischaracterized. She testified that the reason she did not have more supervised visits with the children over the last three years was because it was very expensive to pay for the supervision. She attended all the children's musical concerts and several football games. She helped at the children's schools when she was able. She asked the children about school and was involved in parent-teacher conferences. She sent food to Jeffrey's house when he and the children were all sick and, when the air conditioning was broken, she sent fans.

¶ 25   Megan testified that she had weekly therapy with two of the children "for a duration of several months, if not a year." The relationships were improving. But when the counseling stopped, she was out of sight and out of mind. Megan testified that, since May 2022, she had been requesting a return to mediation so that she could start to have unsupervised visitation. Jeffrey was not cooperating with her efforts to do so.

¶ 26   Finally, Megan testified that since the time she had been granted only supervised visitation, the children's grades and health had declined. She believed it was difficult being a single parent, and it would be better to have both parents nearby to help with raising the children. Even though the children lived with Jeffrey, she had received phone calls over the last couple years from the children when they were upset or needed help. She would not be able to offer any help if the children lived in Washington. While the children may have expressed indifference to the move, Megan stated the court needed to consider that the children were still traumatized from the divorce and may be afraid of hurting their father's feelings. Megan stated that she would not be able to exercise parental responsibilities if the children moved and that Jeffrey could easily find a place to

live and work in Illinois. She argued that relocation to Washington would permanently impair her relationship with her children.

¶ 27 Following argument, the trial court rendered its ruling. The trial court stated that it considered the arguments of the parties, the testimony of the witnesses and their credibility, the entire court file, and the statutory factors, set forth in section 609.2(g) of the Act (750 ILCS 5/609.2(g) (West 2024)), to be used in assessing a parent's request for relocation. The trial court noted that the facts in this case were "sad and atrocious" and that it was faced with two bad options. Allowing the relocation would distance the children from their mother, but not allowing it would force the children into substandard housing while their father was without assistance. The trial court addressed each of the statutory factors.

¶ 28 The first factor was the circumstances and reason for the intended relocation. *Id.* § 609.2(g)(1). The trial court found that Jeffrey had a legitimate reason for the relocation as he was asked to leave his current residence. The trial court stated that this factor weighed in favor of relocation considering Jeffrey's income and inability to find appropriate housing nearby for himself and four children. The second factor to consider was the reason for objection to the relocation. *Id.* § 609.2(g)(2). The trial court found that Megan had a genuine basis to object because she had legitimate concerns as to how the relocation would affect her relationship with the children. The trial court found that this factor favored denial of relocation.

¶ 29 The third factor was the history and quality of the parents' relationships with the children. *Id.* § 609.2(g)(3). The trial court stated that this factor carried a lot of weight. The trial court noted that the oldest child would soon turn 18 and the second oldest would also soon reach the age of majority. The trial court noted that time was running out and efforts at reunification with Megan had failed. The trial court acknowledged the evidence that long-distance counseling was not as

effective as in person but noted that there was currently not effective counseling with the children in Illinois. The trial court stated that it was not blaming one or the other parent. Rather, the trial court stated that both parents contributed to the poor situation and that the children were paying the price. The trial court noted the GAL's testimony that the children had become accustomed to the dysfunction in their lives and found that this was not a positive statement. The trial court noted that Megan had only eight three-hour parentings session over the last few years and found that the children's relationship with Megan had deteriorated to a "point that [was] sad." The trial court noted that the children needed both parents, but they did not have that. The trial court concluded that the third factor favored relocation.

¶ 30    The fourth factor was the change in educational opportunities for the children because of relocation. *Id.* § 609.2(g)(4). The trial court found the evidence uncontradicted that the school district the children would attend in Washington was more highly rated than their current school district in Illinois. The trial court concluded that the educational opportunities for the children favored relocation.

¶ 31    The fifth factor was the presence or absence of extended family. *Id.* § 609.2(g)(5). The trial court noted that neither of the parties had family in Illinois. Megan's family was in New Jersey and Jeffrey's family was in Washington. The trial court acknowledged Megan's testimony that she was willing and able to help care for the children. The trial court found, however, that the evidence indicated that the children were not ready for that due to the history in the case and the breakdown in counseling. The trial court found that Megan and Jeffrey were both at fault for the breakdown. The trial court concluded that the fifth factor weighed in favor of relocation due to the presence of extended family in Washington to help care for the children.

¶ 32    The sixth factor to consider was the anticipated impact of the relocation on the children. *Id.* § 609.2(g)(6). The trial court stated that this was a difficult factor because it could be argued both ways. A move would result in the children being farther away from their mother, which was not a positive for the children. On the other hand, the facts showed a breakdown in counseling and communication between Megan and the children. The trial court stated that a move could arguably make the heart grow fonder. The trial court concluded that the sixth factor was neutral.

¶ 33    The seventh factor was whether the trial court "will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs." *Id.* § 609.2(g)(7). The trial court noted that Jeffrey was currently the sole party with parental decision-making authority. The question was whether something could be done to restore the children's relationships with Megan. The trial court stated that the attempts over the last three years had failed. Nonetheless, the trial court believed that there were things it could do to improve the relationship between the children and Megan, and that it could be done whether they were in Illinois or Washington. The trial court found that this factor did not weigh against relocation.

¶ 34    The eighth factor was the wishes of the children. *Id.* § 609.2(g)(8). The trial court acknowledged the GAL's testimony regarding the wishes of the children but agreed with Megan that those wishes may not have been completely honest. The trial court believed the children would say things around Megan to make her happy and would say other things around Jeffrey to make him happy. The trial court stated that, nonetheless, all it had to go on was the GAL's testimony that none of the children objected to the relocation and that J.N. wanted to move. The trial court concluded that this factor weighed in favor of relocation.

¶ 35    The ninth factor was the possible arrangements for exercise of parental responsibilities, appropriate to the parents' resources. *Id.* § 609.2(g)(9). The trial court noted that this factor was

not relevant under the facts in this case. The trial court found that the children had a strained relationship with Megan and the only concern was what to do now. The trial court thus turned to the tenth factor, how to minimize further strain on the relationships with Megan if the children were allowed to relocate. *Id.* § 609.2(g)(10). The trial court believed that there were things that could be done and thus found that the tenth factor favored relocation.

¶ 36    The final factor was any other relevant factors bearing on the children's best interests. *Id.* § 609.2(g)(11). The trial court noted that there was a court order that prohibited Megan's friend, Gerstel, from being around the children. The evidence revealed two occasions when this was violated. Gerstel went to one of J.N.'s football games with Megan, and J.N. was upset about it. On another occasion, Gerstel was in the background listening to conversations between Megan and the children, and Gerstel yelled at the children during the call. The trial court found that, on those occasions, Megan put her relationship with Gerstel ahead of her children.

¶ 37    After consideration of all the statutory factors, the trial court granted the motion to relocate. The trial court noted that the ability for Jeffrey to live with his parents would free up income to increase the quality of life for the children and allow them to participate in more activities. The trial court believed its decision was in the best interests of the children. The trial court ordered remote counseling to attempt a reconciliation between Megan and the children. Megan was responsible for finding a counselor and arranging the counseling, and Jeffrey was ordered to ensure that the children participate. Once the counselor determined that it was clinically appropriate, Jeffrey was required to provide three roundtrip tickets every year for Megan to travel to Washington. Megan was responsible for her own accommodation when visiting. Jeffrey was ordered to allow telephone and text contact between Megan and the children. He was also required to allow Megan access to websites in the new school district related to the children and their

academic progress. Megan was allowed to contact the children via Zoom or Facetime every Monday and Thursday evening for one hour. Thereafter, Megan filed a timely notice of appeal.

¶ 38                                                    II. ANALYSIS

¶ 39    On appeal, Megan argues that the trial court erred in giving the petition for relocation an emergency status and setting it for hearing prior to 21 days after the withdrawal of her limited scope attorney. Megan also argues that the trial court erred in weighing the statutory factors and granting the petition for relocation. The parties do not dispute that we have jurisdiction to hear this appeal under Supreme Court Rule 304(b)(6) (eff. Mar. 8, 2016) (providing that an order setting or modifying allocation of parental responsibilities within a dissolution proceeding is a final appealable order without regard to the pendency of remaining issues). See *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 30 (as the relocation petition modified allocation of the parties' parenting time and parental responsibilities, it was immediately appealable under Rule 304(b)(6)).

¶ 40    Section 609.2(g) of the Act codifies the factors a court must consider when ruling on a petition for relocation. *Id.* § 609.2(g). In determining whether relocation is in a child's best interests, the trial court must consider the following 11 factors:

> "(1) the circumstances and reasons for the intended relocation;
>
> (2) the reasons, if any, why a parent is objecting to the intended relocation;
>
> (3) the history and quality of each parent's relationship with the child and specifically whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment;
>
> (4) the educational opportunities for the child at the existing location and at the proposed new location;

(5) the presence or absence of extended family at the existing location and at the proposed new location;

(6) the anticipated impact of the relocation on the child;

(7) whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs;

(8) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to relocation;

(9) possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child;

(10) minimization of the impairment to a parent-child relationship caused by a parent's relocation; and

(11) any other relevant factors bearing on the child's best interests."  750 ILCS 5/609.2(g) (West 2018).

¶ 41    "The party seeking judicial approval of the proposed relocation must establish by a preponderance of the evidence that the relocation is in the child's best interests." *In re Marriage of Kavchak*, 2018 IL App (2d) 170853, ¶ 65 (citing *In re Marriage of Eckert*, 119 Ill. 2d 316, 325 (1988)).  The determination of a child's best interests cannot be reduced to a bright-line test. Rather, it must be made on a case-by-case basis as such a determination is largely dependent upon the specific circumstances of each case.  *Id.*  We review the trial court's determination deferentially, as it is in a better position "to observe both the parents *** and therefore it is able to assess and evaluate their temperaments, personalities, and capabilities." *Id.*  Accordingly, "[a] trial court's determination of what is in the best interests of the child should not be reversed unless it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has

occurred." *Eckert*, 119 Ill. 2d at 328. A decision is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent or where its findings are unreasonable, arbitrary, or not based on the evidence presented. *Kavchak*, 2018 IL App (2d) 170853, ¶ 65. We do not reweigh the competing considerations and we should affirm the trial court's determination unless it is clearly unjust. *In re Marriage of Tedrick*, 2015 IL App (4th) 140773, ¶ 51.

¶ 42    Megan's first contention on appeal is that the trial court erred in not granting her sufficient time to find new counsel after the withdrawal of her limited scope attorney. Her limited scope attorney was allowed to withdraw on February 13, 2024, and Megan was granted 21 days to find new counsel or appear *pro se*. The hearing on the petition for relocation occurred only seven days after the withdrawal was granted. Megan argues that this violated her 21-day right to find new counsel. Upon review of the record, we find no error. The record shows that the limited scope attorney was representing Megan with respect to her motion for unsupervised visitation and for joint parental decision-making authority. In contrast, the record demonstrates that Megan was representing herself with respect to Jeffrey's petition for relocation. After he filed the notice of intent to relocate, Megan filed a *pro se* appearance and a *pro se* objection. After Jeffrey filed his petition for relocation, Megan filed a *pro se* response to the petition. Accordingly, as the record shows that the limited scope attorney was not representing Megan with respect to the issue of relocation, the trial court did not err in holding a hearing on the petition for relocation prior to the 21 days Megan was allowed to replace her limited scope attorney.

¶ 43    Megan's next contention on appeal is that the trial court erred in granting Jeffrey's petition for relocation "emergency" status under Kendall County Circuit Court Rule 5.45 (23rd Judicial Cir. Ct. R. 5.45 (Jan. 31, 2017) (setting forth criteria to be considered an "emergency" matter). This argument is without merit. First, the record shows that Jeffrey did not plead his petition for

relocation as an emergency motion under Rule 5.45 and the trial court never granted it emergency status under that rule. Rather, the trial court found that it was an emergency based on the time frame in which Jeffrey and the children were required to move. The trial court noted that Jeffrey had to move out of his house by March 1, 2024, and the only date available for hearing on the petition for relocation prior to the move out date was February 21, 2024. The trial court thus held the hearing on, as the trial court stated, an "expedited" basis. Based on the date that Jeffrey had to move out of his rented home and because the petition to relocate was filed a month prior to the hearing, we cannot say that the trial court abused its discretion in expediting the hearing on relocation. See *People v. Coleman*, 183 Ill. 2d 366, 387 (1998) (decisions concerning control of the court's docket are reviewed for abuse of discretion).

¶ 44 Megan next argues that the trial court erred in holding the hearing on the petition for relocation prior to having a hearing on her motion to modify allocation of parental-decision making authority and parenting time. Megan asserts that it was improper to have such a hearing prior to a full GAL report and investigation. Megan also argues that, because the trial court limited the hearing to the issue of relocation, she was precluded from presenting relevant evidence.

¶ 45 Megan did not argue in the trial court that her motion to modify should be addressed prior to Jeffrey's petition for relocation, thereby forfeiting this argument for review. See *Gean v. State Farm Mutual Automobile Insurance Co.*, 2019 IL App (1st) 180935, ¶ 19 (issues not raised in the trial court are forfeited and may not be raised for the first time on appeal). Moreover, Megan has failed to cite any authority to support a contention that there was any procedural error in addressing the relocation petition prior to her motion to modify. The failure to cite authority also constitutes forfeiture of an argument. See 210 Ill. 2d R. 341(h)(7) (arguments presented without citation to authority are waived). Further, there is no evidence to support her contention that the GAL did

not complete a full investigation. The trial court appointed a GAL to review the relationships between the parties and their children considering Megan's motion to modify and Jeffrey's petition for relocation. The trial court directed the GAL to prepare to make an oral report, not a written report. Thereafter, the GAL testified at the relocation hearing as to the current situation between the children and the parties. The record does not support the insinuation that the GAL did not conduct a full investigation.

¶ 46    Megan argues that, because the hearing was limited to relocation, she was precluded from presenting relevant evidence. For example, she asserts that she could have presented evidence from counselors related to her relationship with the children and to the children's wishes as to relocation. However, she does not say specifically what the counselors could have testified to that would have affected the outcome of the hearing. Further, the GAL testified that he spoke with the counselors who stated that the children were either not interested or not engaging in counseling. The GAL also stated that he spoke with the children, and they were not against relocation. Moreover, the record demonstrates that the trial court considered all the relevant evidence. Both parties testified and the trial court stated that it reviewed the entire record and the history of the case.

¶ 47    Megan's fourth contention on appeal is that the trial court's ruling on the petition for relocation essentially imposed restrictions on her parenting time and parental responsibilities without the required hearing and proof by a preponderance of the evidence as required by section 603.10 of the Act (750 ILCS 5/603.10 (West 2024) (allowing a trial court, after a hearing, to enter an order restricting parental responsibilities and/or parenting time if a court finds by a preponderance of the evidence that a modification is in a child's best interests). This argument is also without merit. First, as the matter at issue was Jeffrey's petition for relocation, it is controlled

by section 609.2 of the Act (*id.* § 609.2), which allows relocation if it is in the best interests of children. If relocation was denied every time a noncustodial parent's visitation would be modified to less frequent but longer periods, relocation would rarely be granted. See *Ford v. Marteness*, 368 Ill. App. 3d 172, 178 (2006). Moreover, there were no further restrictions placed on Megan's parenting time because of the relocation order. Jeffrey had sole decision-making authority with respect to the children both before and after the relocation order. Further, the record showed that, in the last three years, Megan had only eight supervised visits with the children. The order for relocation provided that, once visitation was approved by a therapist, Jeffrey would provide for Megan to travel to Washington three times per year for in-person visitation. This would result in an increase in face-to-face visitation as compared with the previous three years. The relocation order also provided for regular electronic contact with the children, which was the standard form of communication when the children lived in Illinois. Accordingly, as the matter at issue was relocation and there were no further restrictions on Megan's parental responsibilities or parenting time because of the relocation order, her reliance on section 603.10 of the Act is misplaced.

¶ 48    In so ruling, we note that Megan states that she has been unable to find a counselor licensed in both Illinois and Washington that can perform remote reconciliation counseling. She notes that, per the trial court's order, her opportunity to travel to Washington for visitation is dependent upon approval by the reconciliation counselor. Since she cannot find a counselor, she is unable to seek approval for such visitation. We acknowledge that this presents a real issue in need of resolution. However, this is a factual matter that Megan must first address in the trial court. That court, not this one, has the ability to modify its prior order as needed to preserve Megan's opportunities for parenting time.

¶ 49    Finally, Megan argues that the trial court erred in its consideration of factors 3 through 10 of section 609.2(g) of the Act. We have reviewed the trial court's findings as to each statutory factor and cannot say that the evidence clearly called for the opposite conclusion or that the determination rested on clearly erroneous factual findings. The trial court was in a superior position to observe the parties and the witnesses, and it is not this court's job to reweigh the factors. *Tedrick*, 2015 IL App (4th) 140773, ¶ 51.

¶ 50    We note that a repeated theme in Megan's briefs is that the trial court misconstrued the evidence. For example, Megan argues that the trial court ignored the GAL's statement that reconciliation therapy was best done in person. However, the record shows that the trial court acknowledged this testimony, but still determined, considering all the relevant factors, that relocation was in the best interest of the children. It is well settled that a trial court is not bound by a GAL's recommendations. *Taylor v. Starkey*, 20 Ill. App. 3d 630, 634 (1974). Moreover, the GAL testified that remote reconciliation counseling was possible, and the trial court ordered reconciliation counseling as part of the relocation order.

¶ 51    Megan also argues that the trial court mischaracterized her relationship with the children. She argues that the trial court failed to consider that she attended school functions and joint counseling with the children. The record rebuts this assertion. The trial court acknowledged that she attended school functions, but noted that she had, on occasion, brought Gerstel to those functions in violation of court orders prohibiting his attendance. The trial court also acknowledged the joint counseling sessions but noted that there was differing testimony as to the period of months that such counseling occurred. In addition, the GAL testified that such joint counseling had ended because the children were not engaging. There is nothing in the record to support a conclusion that the trial court misunderstood or ignored any of the relevant evidence. In ordering remote

reconciliation counseling, the trial court acknowledged that repairing Megan's relationship with the children was important. However, the paramount concern was whether relocation was in the best interests of the children. Considering the "strong and compelling" presumption favoring the trial court's decision (*Eckert*, 119 Ill. 2d at 330), we affirm its order.

¶ 52                            III. CONCLUSION

¶ 53    For the reasons stated, we affirm the judgment of the circuit court of Kendall County.

¶ 54    Affirmed.